695 So.2d 1229 (1997)
Edward T. JAMES, Appellant,
v.
STATE of Florida, Appellee.
No. 86834.
Supreme Court of Florida.
April 24, 1997.
Rehearing Denied June 20, 1997.
*1230 James B. Gibson, Public Defender and Michael S. Becker, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General and Mark S. Dunn, Assistant Attorney General, Tallahassee, for Appellee.

OPINION
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Edward James. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the death sentences imposed in this case.

FACTS
On October 19, 1993, the grand jury in and for Seminole County, Florida, returned an indictment charging Edward James with two counts of first-degree murder, one count of aggravated child abuse, one count of attempted sexual battery, one count of kidnapping, one count of grand theft, and one count of grand theft of an automobile. On April 5, 1995, James appeared before the Honorable Alan A. Dickey, Circuit Judge, and, pursuant to a written agreement, entered pleas of guilty to all counts of the indictment and pleas of no contest to two counts of capital sexual battery charged by separate information. The plea did not include an agreement as to sentence. The State sought the death penalty for each of the murders that occurred in this case, and on May 30, 1995, James proceeded to a penalty phase trial before a jury.
The record reflects that on the evening of Sunday, September 19, 1993, James attended a party at Todd Van Fossen's house. James rented a room from one of the victims in this case, Betty Dick, and lived about two blocks away from the Van Fossens. He arrived at 6 p.m. and stayed until approximately 10:30 p.m. Todd's girlfriend, Tina, noticed that James seemed intoxicated by the end of the evening and asked him if he wanted to spend the night, but James declined. James drank between six and twenty-four cans of beer during the party, as well as some "shotguns"three beers drunk through a funnel in a very short period of time. Shortly after leaving the party James ran into Jere Pearson who lived nearby and was returning from the Handy Way convenience store. Jere Pearson was interviewed by the assistant state attorney and the assistant public defender before trial. An audiotape of the interview was played for the jury during the trial.[1]
Pearson stated that when the two met, James was on his way to visit Tim Dick, the victim's son, and his girlfriend, Nichole, who also lived nearby. They stopped and talked for about ten minutes and Pearson watched James ingest about ten "hits" of LSD on paper. James told Pearson he had been drinking at Todd Van Fossen's party, but he appeared sober to Pearson.
After briefly visiting Tim Dick and Nichole where he drank some gin, James returned to his room at Betty Dick's house. When he entered the house, James noticed that Betty *1231 Dick's four grandchildren were asleep in the living room.[2] One of the children, Wendi, awoke briefly when James arrived. She observed that he was laughing and appeared drunk. James went to the kitchen, made himself a sandwich and retired to his room. Eventually, he returned to the living room where he grabbed Betty Dick's eight-year-old granddaughter, Toni Neuner, by the neck and strangled her, hearing the bones pop in her neck. Believing Toni was dead, he removed her clothes and had vaginal and anal intercourse with her in his room. Toni never screamed or resisted. After raping Toni, he threw her behind his bed.
James then went to Betty Dick's bedroom where he intended to have sexual intercourse with her. He hit Betty in the back of the head with a pewter candlestick. She woke up and started screaming, "Why, Eddie, why?" Betty's screaming brought Wendi Neuner to the doorway of her grandmother's bedroom where she saw James stabbing Betty with a small knife. When James saw Wendi he grabbed her, tied her up, and placed her in the bathroom. Thinking that Betty was not dead, James went to the kitchen, grabbed a butcher knife and returned to Betty's room and stabbed her in the back. James removed Betty Dick's pajama bottoms, but did not sexually batter her.
Covered with blood, James took a shower in the bathroom where Wendi remained tied up and then threw together some clothes and belongings. He returned to Betty's room and took her purse and jewelry bag before driving away in her car. James drove across the country, stopping periodically to sell jewelry for money. He finally was arrested on October 6, 1993, in Bakersfield, California, and gave two videotaped confessions to police there. A videotape containing the relevant portions of James' statements was played for the jury.
Dr. Shashi Gore, the chief medical examiner for Seminole County, testified that he performed autopsies on Betty Dick and Toni Neuner. Betty Dick suffered twenty-one stab wounds to the back with the knife still embedded. The wounds damaged both lungs, the liver, and the diaphragm and fractured several ribs. Dick also suffered major stab wounds to the left side of the neck, below the left eye, and on the left ear. A knife blade was also discovered in Dick's hair. Dick died of massive bleeding and shock from the multiple stab wounds to her chest and back. Dr. Gore opined that she died within a few minutes of her assailant's attack.
Toni Neuner suffered contusions to her lips and hemorrhaging in her eyes caused by lack of oxygen from strangulation. Gore opined that the extensive force necessary to create the contusions on her neck indicated that a ligature had been used. Dr. Gore also found contusions around the anal and vaginal orifices. The roof of the vaginal wall was completely torn. Although the substantial amount of blood pooled in the pelvic cavity indicated that Toni Neuner was alive at the time she was sexually assaulted, Dr. Gore could not state that she was conscious when she was raped. Toni Neuner died of asphyxiation due to strangulation.
Dr. E. Michael Gutman, a psychiatrist, testified as a mental health expert witness on James' behalf. He conducted neuropsychological tests on James in August of 1994. Dr. Gutman learned that James' father and grandfather had been alcoholics and James used crack cocaine, LSD, cocaine, marijuana, alcohol, and pills. In Dr. Gutman's opinion, James suffers from alcohol dependence and has an addictive craving for alcohol which he is unable to break. James has above average intelligence and his performance IQ is in the superior range.
James told Dr. Gutman that on the day of the offense, he had been drinking, had used crack cocaine and cannabis, and had taken some pills. He could not remember if he had taken LSD in the hours preceding the offense. Dr. Gutman determined that James has a passive aggressive or an addictive personality. In his opinion, James suffers from poly-substance dependence and abuse, as well as severe dysthymia, a chronic depressive *1232 disorder. James also has unresolved conflicts associated with being abandoned by his father.
Dr. Daniel E. Buffington, a clinical pharmacologist at the University of South Florida, testified for the defense about the effects of alcohol and drug addictions. He explained that if a person like James has an underlying psychological problem, LSD ingestion will most likely unmask it and allow it to come to the surface. The acute phase of affectation due to LSD ingestion is two to twelve hours after ingestion. Possible reactions to LSD include, among others: a psychotic adverse reaction which is accompanied by hallucinations; a psycho-dynamic/psychedelic experience which results in a slow emergence of the subconscious idea or psychological condition; and a cognitive psychedelic reaction which overcomes an individual's ability to control himself.
Dr. Buffington opined that if James had drunk between twenty and thirty cans of beer between the hours of 6 and 11:30 p.m., he most likely had a blood alcohol level of more than three times the legal limit. If James ingested ten "hits" of LSD, about 200 micrograms at a minimumwhich is a heavy dosewhen considered in conjunction with the alcohol use, the peak effect of the LSD ingestion would have occurred between 12:30 a.m. and 1 a.m. The description of the crimes is consistent with the effects that the LSD and alcohol would have had on James. Dr. Buffington explained that such a large dose of LSD could have caused a physical or mental breakdown and a sudden release of aggressive action in someone like James, who suffers from a passive aggressive personality.
Dr. Buffington concluded that James was most probably under the influence of extreme mental or emotional disturbance due to his psychotic reaction and psychodynamic/psychedelic reaction to LSD. James further suffered from a decreased ability to control his behavioral pattern.
Betty and John Hoffpauir testified that they had known James for years. Once James made Betty Hoffpauir's grandson some golf clubs just out of kindness. James worked off and on with John Hoffpauir in his lawn business and would never take any money for helping him.
Betty Lee, who also testified on James' behalf, knew James through her daughter, who had lived next door to Betty Dick. When Betty Lee would visit her daughter, she often would see James playing with Toni and Wendi Neuner out in the front yard. James was also always willing to help Betty Lee's daughter whenever she called on him.
Anthony Mancuso is a volunteer with the Seminole County Correctional Facility and counsels inmates on religious matters. He testified that James is well-liked by the jail personnel as being a non-trouble maker. Once when Mancuso was ill, James wrote him a letter that Mancuso believes reflects James' spiritual growth while in custody. Mancuso explained that he has seen an incredible change in James since he entered the facility.
James also testified on his own behalf at the penalty phase. He was born in Pennsylvania in 1961. At the age of ten, he learned that his biological father had left him when he was just a baby. He eventually went to live with his biological father in Indianapolis when he was fourteen. However, James' father turned out to be a drug dealer and introduced James to marijuana. James moved with his father to Massachusetts, but his father returned to Indianapolis without James two weeks after the move. James has never heard from his father since that time. James subsequently moved to Florida with his mother after she separated from her second husband. He started experimenting with drugs, including marijuana and PCP, and eventually dropped out of school. He did get his GED, however, and entered the army at age seventeen. He started using more drugs in the army and received a general discharge under honorable conditions. James then spent eighteen months hitchhiking around the country and ultimately had a son who was born in March of 1983. James went to San Francisco where he graduated from a computer learning center. One day, James received a phone call from his son's mother who threatened to kill his son unless James would take him. James returned to Florida and took custody of his son, Jesse. *1233 However, James soon realized he was not prepared to raise his son, and his drinking and drug usage increased. His drug abuse caused his relationship with his girlfriend to break up and he distanced himself from his son. From James' birthday on August 4, 1993, until the day of the offense on September 20, 1993, James was steadily intoxicated. James feels ashamed for what he did, especially because he loved Betty and her grandchildren and felt that they were like his own family. James explained that he does not believe his drug abuse excuses his conduct, but it does help to explain it. On the other hand, James also testified that he had never had an adverse reaction when he took LSD and always had good experiences. In addition, he did not remember taking LSD prior to the murders.
Following deliberations, the jury returned advisory penalty recommendations of death for each of the murder convictions. At the subsequent sentencing hearing held on August 18, 1995, the trial court confirmed the previous adjudications of guilt and sentenced James to life in prison with a mandatory minimum of twenty-five years before parole eligibility on each of the capital sexual battery convictions to run concurrent with each other. Additionally, James was sentenced to life in prison on the kidnapping charge, fifteen years on each count of the aggravated child abuse and attempted sexual battery, and five years on each count of grand theft all to run concurrent with each other, but consecutive to the sentences on the capital sexual batteries.
The trial court followed the jury's recommendation and imposed a sentence of death for each of the first-degree murder convictions and filed a sentencing order in support of the death penalty. In aggravation, the trial court found that: (1) each murder was heinous, atrocious or cruel; (2) James was contemporaneously convicted of another violent felony; and (3) each murder was committed during the course of a felony. The trial court also considered sixteen mitigating circumstances applicable to this case, to include the statutory mitigator that James' ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired due to drug and alcohol abuse; and that James was under the influence of moderate mental or emotional disturbance at the time of the offense. The trial court gave both of these mental mitigators "significant weight." The trial court attributed "some weight" to James' past acts of kindness and helpfulness to friends; and his genuine shame and remorse for his offenses. The trial court attributed "substantial weight" to James' full cooperation with authorities in confessing to the crimes and entering pleas of guilty to the offenses he remembered and "no contest" to those he "truly [did] not remember." Additionally, the trial court attributed "some weight" to James' good conduct while incarcerated. In that regard, the trial court finally noted in mitigation that James is capable of offering assistance to others while in custody and serving as an example to others about the negative consequences of illicit drug use.
James raises six claims of error on appeal.[3] We must reject each claim for the reasons set out below.

LAW & ANALYSIS

Prosecutor's Improper Comments
As his first claim of error, James contends that the prosecutor impermissibly urged the jury to consider James' use and possession of illegal drugs as nonstatutory aggravating factors and later told the jury that James was legally sane, which is irrelevant to whether the mental mitigating circumstances had *1234 been proved in this case. James maintains that because these comments were improper, his motion for mistrial should have been granted.
As a preliminary matter, we reject the State's argument that this claim is procedurally barred because James failed to make a timely objection or request a curative instruction. We find that this claim of error has been adequately preserved for appellate review. As we explained in Spencer v. State, 645 So.2d 377 (Fla.1994), defense counsel may conclude upon objection that a curative instruction will not cure the error and choose not to request one: "Thus, a defendant need not request a curative instruction in order to preserve an improper comment issue for appeal. The issue is preserved if the defendant makes a timely specific objection and moves for a mistrial." Id. at 383.
Unlike the circumstances in Nixon v. State, 572 So.2d 1336 (Fla.1990), where the allegedly improper comments came at the beginning of the closing argument and we found that defense counsel's failure to make a contemporaneous objection did not preserve the issue for appeal, the prosecutor's allegedly improper comments in this case came at the end of his closing argument and James immediately moved for a mistrial. Although James did not specifically object to the prosecutor's comments as they were made, the contemporaneous motion for mistrial immediately following the improper comments at the close of the argument was sufficient to preserve the issue for appellate review.
As for the merits of James' claim, this Court has held that prosecutorial misconduct in the penalty phase must be egregious to warrant vacating the sentence and remanding for a new penalty phase proceeding. Garron v. State, 528 So.2d 353 (Fla.1988). Here, in the course of properly rebutting James' claim that his crimes were mitigated by his impairment from the use of drugs and alcohol, the prosecutor unartfully commented: "What the defendant is saying is give me the more lenient of the only two possible penalties for this, these two felonies, capital felonies, because I've committed another felony, i.e., the use and thus possession of illegal drugs." We emphasize that the prosecutor's remark that James' drug use and possession was a felony certainly was not the way to rebut a defendant's claim that his crime is mitigated by his intoxication at the time of the offense. Nevertheless, the prosecutor's ill-chosen remark was an isolated one and he did not characterize the defendant's drug use and possession as aggravating factors as James suggests. This instance of misconduct, by itself, does not warrant a new sentencing trial. See Bertolotti v. State, 476 So.2d 130, 133 (Fla.1985) (finding that although prosecutor's comments exceeded proper bounds of argument, misconduct was not so outrageous as to taint validity of jury's recommendation). Thus, we conclude that the prosecutor's poorly phrased comment was a harmless error as there is no possibility that it contributed to the outcome in this case. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
As for James' claim that the prosecutor made improper comments concerning the testimony of the defense's mental health expert, the prosecutor explained to the jury:
The Defendant tells us on the stand Saturday morning, Saturday afternoon, it'sit wasn't me, it was these hands that did it, but it was the drugs and alcohol. But again, his own witness, the expert witness in this case, Dr. Gutman, the psychiatrist, say this Defendant knew what he was doing when he was committing these murders. He admitted the Defendant knew at the time he was doing these murders, committing the murders that it was wrong, and he knew the consequences of his action at the time he did them.
In the course of these comments the prosecutor never told the jury James was "legally sane" and, therefore, the jury should disregard the mental mitigating circumstances. Instead, the prosecutor merely reminded the jury that the mental health expert had testified that James knew what he was doing when he committed these murders and understood the difference between right and wrong. These comments properly rebutted James' position that his ability to conform his conduct to the requirements of the law was *1235 substantially impaired at the time of the offense. Contrary to James' assertions, this argument by the prosecutor highlighting the inability of the defense's mental health expert to confirm for the jury that James did not know the difference between right and wrong at the time of these murders was not improper. Consequently, we find that the trial court properly exercised its discretion in denying James' motion for mistrial at the end of the prosecutor's closing argument.

The HAC Jury Instruction
As his second claim, James challenges the standard jury instruction on the heinous, atrocious, or cruel aggravator because it is unconstitutionally vague and overbroad and relieves the State of its burden of proving the elements of this aggravating factor. We reject James' challenge to the HAC instruction because the standard instruction given in this case is the same instruction this Court previously approved in Hall v. State, 614 So.2d 473, 478 (Fla.1993), and found sufficient to overcome vagueness challenges to both the instruction and the aggravator. Id.

The HAC Aggravator as to the Murder of Toni Neuner
Next, James contends that the trial court erred in finding that the murder of Toni Neuner was especially heinous, atrocious, or cruel because although the murder of Toni Neuner resulted from strangulation, it was not accompanied by any other acts of torture and from all accounts rendered the victim immediately unconscious.
This Court has stated that when a victim is choked to death, it "can be inferred that `strangulation, when perpetrated upon a conscious victim, involves foreknowledge of death, extreme anxiety and fear, and that this method of killing is one to which the factor of heinousness is applicable.'" Sochor v. State, 580 So.2d 595 (Fla.1991),(quoting Tompkins v. State, 502 So.2d 415, 421 (Fla. 1986)), vacated on other grounds, 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992). Although this Court also has explained that the HAC aggravator does not apply to most instantaneous deaths or to deaths that occur fairly quickly, fear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel. See Wyatt v. State, 641 So.2d 1336 (Fla.1994); Preston v. State, 607 So.2d 404 (Fla.1992).
In this case, the trial court found in its sentencing order that the HAC aggravator was applicable to the murder of Toni Neuner, explaining in pertinent part:
Toni Neuner's death was caused by a lack of oxygen, a cause of death consistent with strangulation. The defendant admitted that he picked Toni up from the couch by her neck. He saw her eyes open and they looked at each other. He looked at her eyes as he squeezed her neck until her eyes and tongue bulged out.... Toni knew the defendant well, and one can only imagine the fear and horror that she felt when her eyes opened and she felt her neck being strangled and the air being cut off from her during this murder as she looked in the defendant's face.
The trial court's findings are fully supported by the record in this case. The medical examiner testified that Toni Neuner died from asphyxiation due to strangulation. In his confession to police shortly after he was apprehended in California, James told police that Toni woke up and opened her eyes and looked at him when he grabbed her by the neck and pulled her up from the couch where she had been sleeping. While the record reflectsand the State does not dispute that Toni died quickly, it is clear that she was conscious of both her attacker and her impending death in the moments preceding her actual death. Consequently, we find that the HAC aggravator was proven beyond a reasonable doubt in this case and the trial court's finding that it applied to the murder of Toni Neuner was not improper.

The Trial Court's Instructions to the Jury
As his fourth claim of error, James argues that the trial court erred in giving the State's requested instruction concerning the "prior violent felony" aggravator, and this Court should recede from precedent and rule that contemporaneous crimes involving multiple victims cannot be used to prove this aggravating factor. Additionally, he contends that it *1236 was error for the trial court to refuse to specifically instruct the jury as to each nonstatutory mitigating factor supported by the evidence. In the event that the requested nonstatutory mitigation instructions were properly denied, James alternatively argues that it was error for the trial court to deny his subsequent request that the jury receive no specific instructions on any of the mitigating factorseither statutory or nonstatutory.
This Court has explained that a trial court has wide discretion in instructing the jury, and the court's decision regarding the charge to the jury is reviewed with a presumption of correctness on appeal. Kearse v. State, 662 So.2d 677, 682 (Fla.1995). In that regard, a trial judge in a criminal case is not constrained to give only those instructions that are contained in the Florida Standard Jury Instructions. Cruse v. State, 588 So.2d 983 (Fla.1991), cert. denied, 504 U.S. 976, 112 S.Ct. 2949, 119 L.Ed.2d 572 (1992).
In this case, the trial court instructed the jury, pursuant to the State's request, that the "prior violent felony" aggravator includes violent felony convictions resulting from crimes committed on separate victims during a single criminal episode, as occurred here. Contrary to James' assertion that the trial court erred in giving this instruction, the instruction is consistent with our caselaw finding that violent felonies committed contemporaneously with the capital crime can qualify under the "prior violent felony" aggravator where, as here, the criminal episode involved multiple victims. See Pardo v. State, 563 So.2d 77 (Fla.1990); Wasko v. State, 505 So.2d 1314 (Fla.1987). Thus, as the trial court correctly explains in its sentencing order, James' murder and violent felony convictions with respect to Toni Neuner aggravate the murder of Betty Dick, and vice versa. Consequently, we find that the trial court's instruction to the jury regarding the "prior violent felony" aggravator is consistent with our prior caselaw, and the trial court did not abuse its discretion in giving the State's requested instruction.
James' related claim that the trial court erred by failing to give his requested jury instructions regarding nonstatutory mitigating factors also is without merit. The trial court is required to give only the "catch-all" instruction on mitigating evidence and nothing more. We have previously rejected in other cases the identical claim James raises here. See generally Johnson v. State, 660 So.2d 637, 642 (Fla.1995) (rejecting claim identical to James' claim here as well as his requested instruction on the weighing process), cert. denied, ___ U.S. ___, 116 S.Ct. 1550, 134 L.Ed.2d 653 (1996); Gamble v. State, 659 So.2d 242, 246 (Fla.1989) (finding that specific instruction as to nonstatutory mental impairment mitigation which fell short of statutory mitigator was not required), cert. denied, ___ U.S. ___, 116 S.Ct. 933, 133 L.Ed.2d 860 (1996); Armstrong v. State, 642 So.2d 730, 734 n. 2 (Fla.1994) (rejecting claim of error for failing to instruct that mitigating evidence need not be found unanimously); Walls v. State, 641 So.2d 381, 389 (Fla.1994) (finding no error in failing to give more detailed instructions on mitigation where the "instruction on mitigating factors has been repeatedly upheld both in this Court and in the federal courts, and we reaffirm its validity today").
Finally, James claims that the trial court erred in denying his alternative request that no instructions as to specific mitigating factors be given to the jury after his specially requested mitigation instructions were rejected by the trial court. Instead, James proposed that the trial court give only the "catch-all" mitigation instruction and nothing more. However, we have mandated that statutory mitigating circumstances must be read to the jury to consider if any evidence regarding them is presented, and failure to do so constitutes reversible error. Robinson v. State, 487 So.2d 1040 (Fla.1986). In this case, the trial court specifically instructed the jury on the two statutory mental mitigators, as well as giving the "catch-all" instruction. Under our case law, the trial court did not have the discretion to do otherwise. Consequently, we find that the trial court did not abuse its discretion in instructing the jury as to the aggravating and mitigating circumstances at issue here.

*1237 The "Extreme Mental or Emotional Disturbance" Mitigator

James asserts that the trial court erred in rejecting as a statutory mitigating circumstance that James was under "extreme mental or emotional disturbance" at the time of the offense because the court's rejection of this statutory mitigator was based on an improper evaluation of the credibility of a key defense witness.
During the penalty phase, James presented the deposition testimony of Jere Pearson, who stated that he ran into James in the neighborhood on the night of the murders and observed James ingest ten "hits" of LSD. Other witnesses who saw James on the night of the offense stated that James did not appear to be on drugs, and James himself, who testified on his own behalf at the penalty phase, stated that he did not remember taking LSD prior to the murders.
The decision as to whether a mitigating circumstance has been established is within the trial court's discretion. Preston v. State, 607 So.2d 404 (Fla.1992). Reversal is not warranted simply because an appellant draws a different conclusion. Sireci v. State, 587 So.2d 450 (Fla.1991), cert. denied, 503 U.S. 946, 112 S.Ct. 1500, 117 L.Ed.2d 639 (1992); Stano v. State, 460 So.2d 890 (Fla. 1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 863 (1985). So long as the trial court considers all the evidence, the trial court's subsequent determination of a lack of mitigation will stand absent a palpable abuse of discretion. Provenzano v. State, 497 So.2d 1177 (Fla.1986), cert. denied, 481 U.S. 1024, 107 S.Ct. 1912, 95 L.Ed.2d 518 (1987).
Here, the trial court considered all the evidence presented as to James' mental state in determining whether his mental or emotional disturbance at the time of the offense rose to the level sufficient to establish it as a statutory mitigator. The sentencing order reflects that the trial court ultimately found Jere Pearson's testimony that James had ingested LSD on the night of the offense to be incredible because Pearson's deposition testimony was "contrary to the other evidence in the case." Consequently, the trial court did not find that James' mental or emotional disturbance rose to the level of a statutory mitigator. Instead, the trial court concluded in its sentencing order that "the defendant was under the influence of moderate mental or emotional disturbance" and accorded this nonstatutory mitigating circumstance "significant weight." In light of these findings, we cannot conclude that the trial court abused its discretion in rejecting James' mental or emotional disturbance as a statutory mental mitigator, especially given the fact that James' mental and emotional disturbance at the time of the offense was accorded "significant" weight as a nonstatutory mitigating factor on an equal par with the "substantial impairment" statutory mental mitigator found be present in this case.

Proportionality
As his last claim of error James maintains that his death sentences in this case must be vacated because they are disproportionate and constitute cruel or unusual punishment in violation of the state and federal constitutions. We find when we consider the circumstances of these murders in relation to other similar decisions that death is not a disproportionate penalty in this case. With respect to the murder of Toni Neuner, see Schwab v. State, 636 So.2d 3 (Fla.1994), which held death appropriate for the murder, kidnapping, and sexual battery of a thirteen-year-old boy where the aggravating factors of prior conviction of violent felony, felony murder and HAC were proven beyond a reasonable doubt and Carroll v. State, 636 So.2d 1316 (Fla.1994), holding death appropriate where the strangulation murder and sexual battery of a ten-year-old victim was supported by HAC. As to the murder of Betty Dick, see Taylor v. State, 630 So.2d 1038 (Fla.1993), holding death appropriate where a fifty-nine-year-old female victim was stabbed approximately twenty-seven times, strangled, and sexually assaulted in her home and Floyd v. State, 569 So.2d 1225 (Fla.1990), holding death appropriate where the elderly female victim was stabbed twelve times during a robbery. Finally, we have previously rejected the claim that Florida's death penalty statute constitutes cruel or unusual punishment. See Thompson v. State, 619 So.2d 261, 267 (Fla.1993).
*1238 For the above reasons, we approve the trial court's sentencing order and affirm James' sentences of death.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING and WELLS, JJ., concur.
ANSTEAD, J., concurs specially with an opinion, in which KOGAN, C.J., and SHAW, J., concur.
ANSTEAD, Justice, specially concurring.
I concur in the majority opinion and write separately only to comment on the apparent relationship between the use of hallucinogenic drugs and the horrible criminal conduct involved in this case. At the outset, I acknowledge that there clearly is an evidentiary basis for the trial court's rejection of James' ingestion of LSD, and I give the trial judge the benefit of being the fact-finder. Nevertheless, I write to express my concern that the effects of LSD[4] and alcohol intoxication may provide the only rational explanation for the defendant's bizarre and horrific conduct in this case, and that trial courts must be alert in considering and evaluating evidence of the use of such drugs in cases like this.
What we have before us in this case is the horrendous circumstances of these murders, combined with the medical expert testimony about the hallucinogenic and psychotic effects of LSD intoxication, as well as Jere Pearson's essentially unchallenged deposition testimony that James ingested at least ten "hits" of LSD a few hours before these murders occurred. Pearson's testimony is straightforward and candid. There is absolutely no suggestion in the record that Pearson had any reason for lying about James' drug use and certainly no reason for trying to aid James through his testimony. I note also that it is not Pearson's testimony that carries the day as to whether James was under the influence of LSD when he committed these crimes, but rather, the glaring inconsistency between James' terrible conduct here and the otherwise silent record as to any past history of violent behavior by him. Other than this crazed killing spree itself, there is no credible evidence in the record that this defendant, who was thirty-two years old at the time of the crime, was capable of the acts in question, absent the use of the mind-altering drugs apparently involved.
This case appears to present the classic horror story with needless tragic consequences that we read about in our papers and tell to our citizens as we implore them to avoid the use of drugsespecially psychedelic and hallucinogenic ones like LSD. Indeed, as the trial judge noted in his sentencing order, Edward James holds himself out as an example of the negative consequences of drug abuse to those with whom he comes in contact in the prison environment.
Thus, notwithstanding the legal integrity of the trial judge's findings, LSD intoxication appears to be the only logical explanation for these crimes, and I caution trial judges to exercise great care when faced with cases like this and give close scrutiny to evidence concerning mental disturbance and psychedelic drug use. We cannot long retain our credibility in warning of the dire consequences of the use of such drugs if we casually brush aside evidence of their use and causal role in cases such as this.
KOGAN, C.J., and SHAW, J., concur.
NOTES
[1] Jere Pearson was called by the defense to testify at trial, but came to court intoxicated. Mr. Pearson failed an Intoxilyzer test and the trial judge refused to let him testify at that time. As an alternative to Pearson's testimony, defense counsel proposed that the audiotape of the interview with Pearson conducted at the State Attorney's Office be played for the jury. The state agreed to defense counsel's proposal and James told the court that he also agreed with his counsel's proposal.
[2] Wendi Neuner, Betty Dick's nine-year-old granddaughter, testified at trial that the children were supposed to spend the night with their uncle, Tim Dick, and his girlfriend Nichole, but did not because Tim and Nichole were drunk on Sunday evening.
[3] The claims are: (1) that the trial court erred in failing to grant James' motion for a mistrial based on the prosecutor's improper comments during closing argument; (2) the trial court erred in overruling James' objection to the standard jury instruction on the heinous, atrocious or cruel (HAC) aggravator on the ground that it is unconstitutionally vague; (3) the trial court erred in finding the HAC aggravator as to the murder of Toni Neuner; (4) the trial court erred in instructing the jury; (5) the trial court improperly rejected the statutory mitigator that the murders were committed while James was under the influence of extreme mental or emotional disturbance; and (6) James' death sentences are disproportionate and cruel and unusual punishment under the state and federal constitutions.
[4] Lysergic acide diethylamide (LSD) is defined as: "A drug, prepared synthetically and related to the alkaloids of ergot, used experimentally in the study of mental disorders. It induces various psychotic disturbances and hallucinations." 3 J.E. Schmidt, Attorneys' Dictionary of Medicine & Word Finder L-227 (1997). See also Stedman's Medical Dictionary 907 (25th ed.1990); Phillip Wolin, Comment, LSDIts Effect on Criminal Responsibility, 17 DePaul L.Rev. 365 (1968).