# Supreme Court of Florida

_____

No. SC2025-0280
_____

**EDWARD T. JAMES,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC2025-0281
_____

**EDWARD T. JAMES,**
Petitioner,

vs.

**SECRETARY, DEPARTMENT OF CORRECTIONS,**
Respondent.

March 13, 2025

PER CURIAM.

Edward T. James, a prisoner under two sentences of death and an active death warrant, appeals the circuit court's summary denial of his successive motion for postconviction relief.  He also

petitions this Court for a writ of habeas corpus, moves for a stay of execution, and requests oral argument.  We have jurisdiction.  *See* art. V, §§ 3(b)(1), (9), Fla. Const.  As we explain below, we affirm the summary denial of James's postconviction motion, and we deny his habeas petition, his motions for stay of execution, and his request for oral argument.

## FACTS AND PROCEDURAL BACKGROUND

The following facts were set forth in this Court's opinion on direct appeal:

> On October 19, 1993, the grand jury in and for Seminole County, Florida, returned an indictment charging Edward James with two counts of first-degree murder, one count of aggravated child abuse, one count of attempted sexual battery, one count of kidnapping, one count of grand theft, and one count of grand theft of an automobile.  On April 5, 1995, James appeared before the Honorable Alan A. Dickey, Circuit Judge, and, pursuant to a written agreement, entered pleas of guilty to all counts of the indictment and pleas of no contest to two counts of capital sexual battery charged by separate information.  The plea did not include an agreement as to sentence.  The State sought the death penalty for each of the murders that occurred in this case, and on May 30, 1995, James proceeded to a penalty phase trial before a jury.
> The record reflects that on the evening of Sunday, September 19, 1993, James attended a party at Todd Van Fossen's house.  James rented a room from one of the victims in this case, [B.D.], and lived about two blocks away from the Van Fossens.  He arrived at 6 p.m.

and stayed until approximately 10:30 p.m.  Todd's girlfriend, Tina, noticed that James seemed intoxicated by the end of the evening and asked him if he wanted to spend the night, but James declined.  James drank between six and twenty-four cans of beer during the party, as well as some "shotguns"—three beers drunk through a funnel in a very short period of time.  Shortly after leaving the party James ran into Jere Pearson who lived nearby and was returning from the Handy Way convenience store.  Jere Pearson was interviewed by the assistant state attorney and the assistant public defender before trial.  An audiotape of the interview was played for the jury during the trial.

Pearson stated that when the two met, James was on his way to visit Tim [D.], the victim's son, and his girlfriend, Nichole, who also lived nearby.  They stopped and talked for about ten minutes and Pearson watched James ingest about ten "hits" of LSD on paper.  James told Pearson he had been drinking at Todd Van Fossen's party, but he appeared sober to Pearson.

After briefly visiting Tim [D.] and Nichole where he drank some gin, James returned to his room at [B.D.]'s house.  When he entered the house, James noticed that [B.D.]'s four grandchildren were asleep in the living room.  One of the children, [W.N.], awoke briefly when James arrived.  She observed that he was laughing and appeared drunk.  James went to the kitchen, made himself a sandwich and retired to his room.  Eventually, he returned to the living room where he grabbed [B.D.]'s eight-year-old granddaughter, [T.N.], by the neck and strangled her, hearing the bones pop in her neck.  Believing [T.N.] was dead, he removed her clothes and had vaginal and anal intercourse with her in his room.  [T.N.] never screamed or resisted.  After raping [T.N.], he threw her behind his bed.

James then went to [B.D.]'s bedroom where he intended to have sexual intercourse with her.  He hit [B.D.] in the back of the head with a pewter candlestick.  She woke up and started screaming, "Why, Eddie, why?"

[B.D.]'s screaming brought [W.N.] to the doorway of her grandmother's bedroom where she saw James stabbing [B.D.] with a small knife. When James saw [W.N.] he grabbed her, tied her up, and placed her in the bathroom. Thinking that [B.D.] was not dead, James went to the kitchen, grabbed a butcher knife and returned to [B.D.]'s room and stabbed her in the back. James removed [B.D.]'s pajama bottoms, but did not sexually batter her.

Covered with blood, James took a shower in the bathroom where [W.N.] remained tied up and then threw together some clothes and belongings. He returned to [B.D.]'s room and took her purse and jewelry bag before driving away in her car. James drove across the country, stopping periodically to sell jewelry for money. He finally was arrested on October 6, 1993, in Bakersfield, California, and gave two videotaped confessions to police there. A videotape containing the relevant portions of James' statements was played for the jury.

Dr. Shashi Gore, the chief medical examiner for Seminole County, testified that he performed autopsies on [B.D.] and [T.N.]. [B.D.] suffered twenty-one stab wounds to the back with the knife still embedded. The wounds damaged both lungs, the liver, and the diaphragm and fractured several ribs. [B.D.] also suffered major stab wounds to the left side of the neck, below the left eye, and on the left ear. A knife blade was also discovered in [B.D.]'s hair. [B.D.] died of massive bleeding and shock from the multiple stab wounds to her chest and back. Dr. Gore opined that she died within a few minutes of her assailant's attack.

[T.N.] suffered contusions to her lips and hemorrhaging in her eyes caused by lack of oxygen from strangulation. Gore opined that the extensive force necessary to create the contusions on her neck indicated that a ligature had been used. Dr. Gore also found contusions around the anal and vaginal orifices. The roof of the vaginal wall was completely torn. Although the substantial amount of blood pooled in the pelvic cavity

- 4 -

indicated that [T.N.] was alive at the time she was sexually assaulted, Dr. Gore could not state that she was conscious when she was raped. [T.N.] died of asphyxiation due to strangulation.

Dr. E. Michael Gutman, a psychiatrist, testified as a mental health expert witness on James' behalf. He conducted neuropsychological tests on James in August of 1994. Dr. Gutman learned that James' father and grandfather had been alcoholics and James used crack cocaine, LSD, cocaine, marijuana, alcohol, and pills. In Dr. Gutman's opinion, James suffers from alcohol dependence and has an addictive craving for alcohol which he is unable to break. James has above average intelligence and his performance IQ is in the superior range.

James told Dr. Gutman that on the day of the offense, he had been drinking, had used crack cocaine and cannabis, and had taken some pills. He could not remember if he had taken LSD in the hours preceding the offense. Dr. Gutman determined that James has a passive aggressive or an addictive personality. In his opinion, James suffers from poly-substance dependence and abuse, as well as severe dysthymia, a chronic depressive disorder. James also has unresolved conflicts associated with being abandoned by his father.

Dr. Daniel E. Buffington, a clinical pharmacologist at the University of South Florida, testified for the defense about the effects of alcohol and drug addictions. He explained that if a person like James has an underlying psychological problem, LSD ingestion will most likely unmask it and allow it to come to the surface. The acute phase of affectation due to LSD ingestion is two to twelve hours after ingestion. Possible reactions to LSD include, among others: a psychotic adverse reaction which is accompanied by hallucinations; a psycho-dynamic/psychedelic experience which results in a slow emergence of the subconscious idea or psychological condition; and a cognitive psychedelic reaction which overcomes an individual's ability to control himself.

Dr. Buffington opined that if James had drunk between twenty and thirty cans of beer between the hours of 6 and 11:30 p.m., he most likely had a blood alcohol level of more than three times the legal limit. If James ingested ten "hits" of LSD, about 200 micrograms at a minimum—which is a heavy dose—when considered in conjunction with the alcohol use, the peak effect of the LSD ingestion would have occurred between 12:30 a.m. and 1 a.m. The description of the crimes is consistent with the effects that the LSD and alcohol would have had on James. Dr. Buffington explained that such a large dose of LSD could have caused a physical or mental breakdown and a sudden release of aggressive action in someone like James, who suffers from a passive aggressive personality.

Dr. Buffington concluded that James was most probably under the influence of extreme mental or emotional disturbance due to his psychotic reaction and psychodynamic/psychedelic reaction to LSD. James further suffered from a decreased ability to control his behavioral pattern.

Betty and John Hoffpauir testified that they had known James for years. Once James made Betty Hoffpauir's grandson some golf clubs just out of kindness. James worked off and on with John Hoffpauir in his lawn business and would never take any money for helping him.

Betty Lee, who also testified on James' behalf, knew James through her daughter, who had lived next door to [B.D.]. When Betty Lee would visit her daughter, she often would see James playing with [T.N.] and [W.N.] out in the front yard. James was also always willing to help Betty Lee's daughter whenever she called on him.

Anthony Mancuso is a volunteer with the Seminole County Correctional Facility and counsels inmates on religious matters. He testified that James is well-liked by the jail personnel as being a non-trouble maker. Once when Mancuso was ill, James wrote him a letter that Mancuso believes reflects James' spiritual growth while

in custody.  Mancuso explained that he has seen an incredible change in James since he entered the facility.

James also testified on his own behalf at the penalty phase.  He was born in Pennsylvania in 1961.  At the age of ten, he learned that his biological father had left him when he was just a baby.  He eventually went to live with his biological father in Indianapolis when he was fourteen.  However, James' father turned out to be a drug dealer and introduced James to marijuana.  James moved with his father to Massachusetts, but his father returned to Indianapolis without James two weeks after the move.  James has never heard from his father since that time.  James subsequently moved to Florida with his mother after she separated from her second husband.  He started experimenting with drugs, including marijuana and PCP, and eventually dropped out of school.  He did get his GED, however, and entered the army at age seventeen.  He started using more drugs in the army and received a general discharge under honorable conditions.  James then spent eighteen months hitchhiking around the country and ultimately had a son who was born in March of 1983.  James went to San Francisco where he graduated from a computer learning center.  One day, James received a phone call from his son's mother who threatened to kill his son unless James would take him.  James returned to Florida and took custody of his son, Jesse.  However, James soon realized he was not prepared to raise his son, and his drinking and drug usage increased.  His drug abuse caused his relationship with his girlfriend to break up and he distanced himself from his son.  From James' birthday on August 4, 1993, until the day of the offense on September 20, 1993, James was steadily intoxicated.  James feels ashamed for what he did, especially because he loved [B.D.] and her grandchildren and felt that they were like his own family.  James explained that he does not believe his drug abuse excuses his conduct, but it does help to explain it.  On the other hand, James also testified that he had never had an adverse reaction when

- 7 -

he took LSD and always had good experiences. In addition, he did not remember taking LSD prior to the murders.

Following deliberations, the jury returned advisory penalty recommendations of death for each of the murder convictions. At the subsequent sentencing hearing held on August 18, 1995, the trial court confirmed the previous adjudications of guilt and sentenced James to life in prison with a mandatory minimum of twenty-five years before parole eligibility on each of the capital sexual battery convictions to run concurrent with each other. Additionally, James was sentenced to life in prison on the kidnapping charge, fifteen years on each count of the aggravated child abuse and attempted sexual battery, and five years on each count of grand theft—all to run concurrent with each other, but consecutive to the sentences on the capital sexual batteries.

The trial court followed the jury's recommendation and imposed a sentence of death for each of the first-degree murder convictions and filed a sentencing order in support of the death penalty. In aggravation, the trial court found that: (1) each murder was heinous, atrocious or cruel [(HAC)]; (2) James was contemporaneously convicted of another violent felony; and (3) each murder was committed during the course of a felony. The trial court also considered sixteen [nonstatutory] mitigating circumstances applicable to this case, [in addition to] the statutory mitigator that James' ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired due to drug and alcohol abuse; [the court considered as nonstatutory mitigation] that James was under the influence of moderate mental or emotional disturbance at the time of the offense. The trial court gave both of these mental mitigators "significant weight." The trial court attributed "some weight" to James' past acts of kindness and helpfulness to friends; and his genuine shame and remorse for his offenses. The trial court attributed "substantial weight" to James' full cooperation with

- 8 -

authorities in confessing to the crimes and entering pleas of guilty to the offenses he remembered and "no contest" to those he "truly [did] not remember." Additionally, the trial court attributed "some weight" to James' good conduct while incarcerated. In that regard, the trial court finally noted in mitigation that James is capable of offering assistance to others while in custody and serving as an example to others about the negative consequences of illicit drug use.

*James v. State*, 695 So. 2d 1229, 1230-33 (Fla. 1997) (last alteration in original) (footnotes omitted).

On direct appeal, this Court affirmed James's convictions and sentences. *Id.* at 1238. Those convictions and sentences became final when the United States Supreme Court denied certiorari review on December 1, 1997. *See James v. Florida*, 522 U.S. 1000 (1997).

James filed his initial motion for postconviction relief in 1998, and in 2003, he filed a pro se motion to voluntarily dismiss his postconviction proceedings and counsel. *See James v. State*, 974 So. 2d 365, 366 (Fla. 2008). The circuit court held a hearing pursuant to *Durocher v. Singletary*, 623 So. 2d 482 (Fla. 1993), to determine whether James was competent to proceed and whether he understood the consequences of dismissal. *James*, 974 So. 2d at 366. The circuit court later entered an order dismissing James's

motion and discharging collateral counsel.  *Id.*  In 2005, James sought to reinstate his postconviction motion.  *Id.*  The circuit court denied his request, and he appealed the ruling to this Court.  *Id.* at 366-67.  This Court concluded that the circuit court "conducted a comprehensive *Durocher* inquiry in 2003" and affirmed the circuit court's finding that James was competent to waive his postconviction proceedings.  *Id.* at 367-68.

In August 2018, the Capital Habeas Unit for the Office of the Federal Public Defender for the Northern District of Florida was appointed to represent James for the purpose of litigating federal habeas claims, and it subsequently filed an initial federal habeas petition.  In January 2019, Capital Collateral Regional Counsel successfully sought reappointment as James's counsel for the purpose of exhausting his state-court claims.  James's federal habeas claims were stayed pending the resolution of his state-court postconviction litigation.

In November 2019, James filed a successive motion for postconviction relief.  The motion raised five claims, including two claims of ineffective assistance of counsel, one claim that James was incompetent at the time of his postconviction waiver, one claim

for relief pursuant to *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), and one claim of cumulative error. *See James v. State*, 323 So. 3d 158, 160 (Fla. 2021), *cert. denied*, 142 S. Ct. 1678 (2022). The circuit court later denied James's motion, and this Court affirmed. *Id.*

The federal district court lifted the stay of habeas proceedings in 2021, and in 2022, James filed an amended petition for writ of habeas corpus. In September 2024, the district court denied the habeas petition and a certificate of appealability. *See James v. Sec'y, Dept. of Corr.*, No. 6:18-cv-00993-WWB-RMN (M.D. Fla. Sept. 6, 2024). In February 2025, the United States Court of Appeals for the Eleventh Circuit issued an order denying James's motion for certificate of appealability. *James v. Sec'y, Dept. of Corr.*, No. 24-14162 (11th Cir. Feb. 3, 2025) (unpublished).

Governor Ron DeSantis signed James's death warrant on February 18, 2025. James filed a successive motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851, which the circuit court summarily denied on February 26, 2025.

James timely appealed the denial of postconviction relief and raises three claims. He also raises one claim in a petition for writ of

- 11 -

habeas corpus and seeks a stay of execution. We address each of these issues in turn and explain why James is not entitled to relief.

## ANALYSIS

"Summary denial of a successive postconviction motion is appropriate '[i]f the motion, files, and records in the case conclusively show that the movant is entitled to no relief.'" *Owen v. State*, 364 So. 3d 1017, 1022 (Fla. 2023) (quoting *Bogle v. State*, 322 So. 3d 44, 46 (Fla. 2021) (alteration in original)). We review the circuit court's decision de novo, "accepting the movant's factual allegations as true to the extent they are not refuted by the record, and affirming the ruling if the record conclusively shows that the movant is entitled to no relief." *Id.* at 1022-23 (quoting *Walton v. State*, 3 So. 3d 1000, 1005 (Fla. 2009)).

### 1. Totality of the Circumstances

In his first postconviction claim, James argued to the circuit court that based on the totality of the circumstances, his execution would violate the Eighth Amendment prohibition against cruel and unusual punishment. These circumstances include: (1) the nearly thirty years that have elapsed between the date of James's convictions and the signing of his death warrant; (2) his cognitive

decline over time; (3) his physical and mental decline in the wake of a near-fatal heart attack in 2023; and (4) other hardships.

Under rule 3.851(d)(1), "[a]ny motion to vacate judgment of conviction and sentence of death shall be filed by the defendant within 1 year after the judgment and sentence become final." Fla. R. Crim. P. 3.851(d)(1). There are three exceptions to raising postconviction claims outside of the one-year timeframe:

> (A) the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence, or
>
> (B) the fundamental constitutional right asserted was not established within the period provided for in subdivision (d)(1) and has been held to apply retroactively, or
>
> (C) postconviction counsel, through neglect, failed to file the motion.

Fla. R. Crim. P. 3.851(d)(2)(A)-(C).

The circuit court rejected James's totality of the circumstances claim as untimely and procedurally barred, as well as on the merits. He challenges the circuit court's procedural rulings, contending that his claim regarding the totality of the circumstances involves his current condition, and, for that reason, has not been ripe until now.

- 13 -

Even if we assume that neither untimeliness nor a procedural bar precludes consideration of this claim on the merits, James is not entitled to relief. A significant aspect of James's claim is that his nearly thirty-year stay on death row constitutes cruel and unusual punishment. However, in *Booker v. State*, 969 So. 2d 186, 200 (Fla. 2007), this Court observed—and we continue to observe— that "no federal or state court has accepted the argument that a prolonged stay on death row constitutes cruel and unusual punishment."

Moreover, this claim has been consistently raised in this Court's death warrant cases and, as James concedes, has been repeatedly rejected by this Court. *See Owen*, 364 So. 3d at 1027 (declining to recognize Owen's claim that thirty-seven years on death row constitutes cruel and unusual punishment); *Dillbeck v. State*, 357 So. 3d 94, 103 (Fla. 2023) (affirming the denial of Dillbeck's claim that executing him after thirty years on death row constitutes cruel and unusual punishment, "consistent with our longstanding precedent that such claims are 'facially invalid,' " and concluding that "Dillbeck's arguments about conditions on death row do not persuade us that our precedent is 'clearly erroneous' ");

- 14 -

*Gaskin v. State*, 361 So. 3d 300, 308 (Fla. 2023) (also rejecting claim that Gaskin's more than three decades on death row constituted cruel and unusual punishment).

Moreover, we agree with the circuit court that even in light of James's allegations relating to cognitive and physical issues and other hardships, James's death sentence does not constitute cruel and unusual punishment. Notably, with respect to James's pattern of cognitive decline—a matter which the State generally does not dispute—we agree with the circuit court that James's cognitive issues do not shield him from execution:

> The Florida Supreme Court has specifically stated, "We have long held that the categorical bar of *Atkins* [*v. Virginia*, 536 U.S. 304 (2002)] that shields the intellectually disabled from execution does not apply to individuals with other forms of mental illness or brain damage." *Dillbeck*, 357 So. 3d at 100 (emphasis added); *see also Gordon v. State*, 350 So. 3d 25, 37 (Fla. 2022) ("[F]or purposes of the Eighth Amendment, the existence of a traumatic brain injury does not reduce an individual's culpability to the extent they become immune from capital punishment."). Thus, Defendant cannot establish that his condition shields him from execution or that his execution violates the Eighth Amendment's prohibition against cruel and unusual punishment.

(Emphasis and footnote omitted.)

Moreover, also without merit is James's claim that various conditions of his confinement render his death sentence in violation of the Eighth Amendment. *See Cole v. State*, 392 So. 3d 1054, 1064 (Fla. 2024) (affirming circuit court's finding that defendant provided no authority to support that his conditions-of-confinement claim "serves as a valid basis to vacate a death sentence, nor does he attempt to explain how his claim would be cognizable under rule 3.851").

These circumstances taken together, James is not entitled to relief. *See Orme v. State*, 361 So. 3d 842, 845 (Fla. 2023) (rejecting argument that totality of the circumstances of Orme's sentence, including thirty years on death row, amounts to cruel and unusual punishment in violation of the Eighth Amendment and the Florida Constitution).

### 2. 2023 Brain Scans

Rule 3.851(d)(2)(A) provides an exception to the one-year requirement where "the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence." Fla. R. Crim. P. 3.851(d)(2)(A). In that instance, "any claim of newly

discovered evidence in a death penalty case must be brought within one year of the date such evidence was discovered or could have been discovered through the exercise of due diligence." *Glock v. Moore*, 776 So. 2d 243, 251 (Fla. 2001); *see also Jimenez v. State*, 997 So. 2d 1056, 1064 (Fla. 2008).

In James's postconviction motion, he claimed that the results of brain scans conducted on him in 2023—following a near-fatal heart attack in January 2023—render his execution in violation of the Eighth and Fourteenth Amendments. He generally framed this claim as one of newly discovered evidence, stating that the scans were not previously available to counsel and asserting that the results constitute "significant new evidence relevant to 'the type of individualized consideration . . . required by the Eighth and Fourteenth Amendments in capital cases.'"

However, James's 3.851 motion did not offer argument in support of the second of the two prongs required in order to prevail on a claim of newly discovered evidence:

> First, in order to be considered newly discovered, the evidence "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence."

- 17 -

Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.

*Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998) (alteration in original) (citation omitted). To establish the second prong of *Jones* for the purpose of obtaining a new penalty phase, James must show that "the newly discovered evidence would probably yield a less severe sentence." *Long v. State*, 271 So. 3d 938, 942 (Fla. 2019) (quoting *Walton v. State*, 246 So. 3d 246, 249 (Fla. 2018)).

Now, on appeal, James argues that the brain scans are newly discovered evidence and that they would likely produce a lesser sentence at a new penalty phase. We take seriously the State's argument of facial insufficiency as to this claim and will only consider the newly discovered evidence issue in light of the circuit court's order addressing the claim as one of newly discovered evidence.

James's failure to demonstrate that he would probably receive a less severe sentence at a new penalty phase is dispositive. Rejecting James's claim, the circuit court explained:

Defendant alleges that his execution would violate the Eighth and Fourteenth Amendments based on the results of his 2023 brain scans that were not previously

- 18 -

available to him. He asserts that federal counsel requested all relevant medical records following his heart attack. On March 24, 2023, counsel received records from UF Health Gainesville indicating a CT scan of Defendant's brain had been performed, but the results were not provided. Counsel sent a second request to UF Health Gainesville but was told no imaging records existed. She sent a third request, then sought a status report on the third request nine more times. Counsel finally received the CT scan results on February 14, 2025. Defendant claims that the results revealed significant evidence of brain dysfunction that predated his heart attack (potentially by decades), is progressive in nature, and was further expedited by an anoxic injury from the heart attack. He argues that these findings constitute "significant new evidence."

. . . .

[T]he Court finds that even if the CT scan results constituted newly discovered evidence, Defendant cannot establish that such evidence would likely yield a less severe sentence at a new penalty phase. . . . [T]he law that shields the intellectually disabled from execution does not apply to individuals with brain damage. *Dillbeck*, 357 So. 3d at 100; *Gordon*, 350 So. 3d at 37. Defendant is therefore not entitled to relief on Claim 2.

Moreover, James has not established that the alleged newly discovered evidence would probably yield a less severe sentence at a new penalty phase in light of the weighty aggravation found as to each murder. James's penalty phase jury considered, and the trial court found, multiple mitigating circumstances, including ones relating to mental health. Yet, the jury's recommendation and the trial court's determination that death was the appropriate sentence

- 19 -

for each murder were made in light of three weighty aggravating factors, including the contemporaneous murders of the victims and the finding of HAC as to each murder. James's adult victim, B.D., died as a result of massive bleeding from dozens of stab wounds, and his eight-year-old victim, T.N., died from strangulation. *See Dillbeck*, 357 So. 3d at 102 (concluding that the appellant could not demonstrate probability of a less severe sentence on retrial in light of weighty aggravating factors). James is not entitled to relief.

### 3. Unanimity

James also argued in his postconviction motion that his execution would violate the Eighth Amendment because one juror voted to spare his life. In his 2019 successive postconviction motion after the United States Supreme Court's decision in *Hurst v. Florida*, 577 U.S. 92 (2016), James argued that his nonunanimous jury recommendation violated the Sixth Amendment. The circuit court denied the claim as untimely, and this Court affirmed on that ground, while also adding that James would not be entitled to relief in light of *State v. Poole*, 297 So. 3d 487 (Fla. 2020), and because his convictions and sentences became final in 1997. *See James*, 323 So. 3d at 161.

In *Poole*, this Court held:

> [W]e further erred in *Hurst v. State* when we held that the Eighth Amendment requires a unanimous jury recommendation of death. The Supreme Court rejected that exact argument in *Spaziano* [*v. Florida*, 468 U.S. 447 (1984)]. *See Spaziano*, 468 U.S. at 465; *see also Harris v. Alabama*, 513 U.S. 504, 515 (1995) ("The Constitution permits the trial judge, acting alone, to impose a capital sentence."). We are bound by Supreme Court precedents that construe the United States Constitution.

297 So. 3d at 504.

Having previously challenged his nonunanimous death sentence on *Hurst* grounds, James seeks to avoid a procedural bar by arguing that this claim is not a *Hurst* claim, but rather an Eighth Amendment "evolving standards of decency" claim. However, we have rejected similar claims. In *Zack v. State*, 371 So. 3d 335 (Fla. 2023), this Court recently stated: "Even if timely and not barred, to the extent Zack frames this issue as one of 'evolving standards of decency' under the Eighth Amendment, this Court rejected precisely the same argument in *Dillbeck*." *Id.* at 350. "Because the Supreme Court's Eighth Amendment precedent to which we are bound does not require a unanimous jury recommendation for death during the penalty phase, the postconviction court properly found this claim to be meritless." *Id.* We also reject James's argument that unanimity

- 21 -

rules governing guilt phase proceedings apply in the context of the penalty phase.

## 4. Habeas Claim

In his habeas petition, James argues that this Court should reconsider its prior decision that his postconviction claims were untimely. In *James*, 323 So. 3d at 160-61, this Court affirmed the circuit court's ruling that two claims of ineffective assistance of counsel, a claim that James was not competent to waive his state postconviction proceedings, and a cumulative error claim were untimely.[1] James argues that as a result of this decision, he has been precluded from receiving merits review of constitutional claims, and he maintains that manifest injustice has resulted. He argues that the ends of due process warrant reconsideration of this Court's rulings regarding the timeliness of his ineffective assistance of counsel and competency claims. We disagree.

At the outset, we observe that while James seeks to revisit prior competency issues, he does not argue that he is incompetent

---

1. This Court also concluded that James's claim pursuant to *Hurst v. Florida*, 577 U.S. 92 (2016), was procedurally barred and untimely.

to be executed. Moreover, although he has demonstrated a cognitive decline, James, who has a current full-scale IQ of 115, does not claim to be intellectually disabled as a bar to his execution.

We decline to revisit this Court's decision affirming the findings that his postconviction claims were untimely, and we reject James's argument that a failure to reconsider his timeliness rulings amounts to manifest injustice. *See Williams v. State*, 316 So. 2d 267, 274 (Fla. 1975) (stating that a defendant has the burden of proving manifest injustice and that "[i]n other words, clear prejudice must be shown").

First, this Court has not held that amended Florida Rule of Criminal Procedure 3.851—no longer permitting the waiver of postconviction counsel—applies retroactively.[2] Second, other inmates' waiver proceedings are not, without more, a viable basis for relief. As the State observes, "there are no opinions from this or any other court to support James'[s] claim that the lower court

---

2. *See In re Amends. to Fla. Rule of Crim. Proc. 3.851 and Fla. Rule of App. Proc. 9.142*, 351 So. 3d 574, 575 (Fla. 2022).

- 23 -

rulings in those cases were proper under the law existing at the time those events occurred. James has not shown that he is being treated unfairly." Third, James's effort to introduce recent brain scans to challenge his 2003 postconviction waiver is improper where that waiver was upheld in 2008 based on a finding that the waiver was knowingly, voluntarily, and intelligently made. At that time, this Court concluded: "In the present case, the record reflects that the circuit court conducted a comprehensive *Durocher* inquiry in 2003 and found that James was competent to discharge counsel and dismiss all postconviction proceedings." *James*, 974 So. 2d at 367.

### 5. Motions for Stay of Execution

James has filed motions for a stay of execution to accompany both his postconviction appeal and his habeas petition. However, we decline to grant a stay of execution and deny both motions because James has failed to raise substantial grounds upon which relief might be granted. *See Buenoano v. State*, 708 So. 2d 941, 951 (Fla. 1998) (denying motion for stay of execution where movant failed to establish "substantial grounds upon which relief might be granted" (citing *Bowersox v. Williams*, 517 U.S. 345 (1996))).

**CONCLUSION**

For these reasons, we affirm the denial of James's successive motion for postconviction relief. We also deny his petition for a writ of habeas corpus and his motions for stay of execution. Having fully considered the record and the parties' briefing, we also deny James's request for oral argument.

No rehearing will be entertained by this Court, and the mandate shall issue immediately.

It is so ordered.

MUÑIZ, C.J., and CANADY, LABARGA, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.

An Appeal from the Circuit Court in and for Seminole County,
    Melanie Freeman Chase, Judge
    Case No. 591993CF003237A000XX
And an Original Proceeding – Habeas Corpus

Dawn B. Macready, Capital Collateral Regional Counsel, North Region, Tallahassee, Florida,

    for Appellant/Petitioner

James Uthmeier, Attorney General, Timothy A. Freeland, Senior Assistant Attorney General, and Michael W. Mervine, Senior Assistant Attorney General, Tallahassee, Florida,

    for Appellee/Respondent