597 So.2d 786 (1992)
Krishna MAHARAJ, Appellant,
v.
STATE of Florida, Appellee.
No. 71646.
Supreme Court of Florida.
March 26, 1992.
Rehearing Denied May 28, 1992.
Kenneth E. Cohen, Kroll & Tract, Miami, for appellant.
Robert A. Butterworth, Atty. Gen. and Michael J. Neimand, Asst. Atty. Gen., Miami, for appellee.
PER CURIAM.
Krishna Maharaj appeals his convictions and sentences for two counts of first-degree murder, two counts of kidnapping, *787 and the unlawful possession of a firearm while engaged in a criminal offense. Maharaj was sentenced: (1) to death for the murder of Duane Moo Young; (2) to life imprisonment without the possibility of parole for twenty-five years for the murder of Derrick Moo Young; (3) to two life imprisonment terms for the kidnapping convictions; and (4) to fifteen years for possession of the firearm to run consecutively to each of the above sentences. We have jurisdiction[1] and affirm all convictions and sentences.
These murders occurred as a result of an ongoing dispute between Derrick Moo Young and Krishna Maharaj. Maharaj was arrested after an accomplice of his, Neville Butler, was questioned by the police and inculpated Maharaj.
During the trial, the primary witness for the State was Neville Butler. Butler testified that in June, 1986, he worked for The Caribbean Echo, a weekly newspaper directed to the West Indian community in South Florida. Prior to Butler's employment, the Echo had published an article, in May, 1986, accusing Derrick Moo Young of theft. When Butler joined the Echo, he assisted the publisher, Elsee Carberry, in writing an article in July, 1986, which charged Maharaj with illegally taking money out of Trinidad. Butler testified that on October 10, 1986, an article was published in the Echo accusing Maharaj of forging a $243,000 check. This article explained that the check was the basis for a lawsuit that Moo Young had filed against Maharaj.
Butler testified that in September, 1986, he was unhappy working for the Echo and contacted Maharaj seeking employment with The Caribbean Times, Maharaj's newspaper. Butler testified that, at Maharaj's urging, he arranged for a meeting between Derrick Moo Young and Maharaj at the DuPont Plaza Hotel in Miami so that Maharaj could extract a confession from Moo Young regarding his extortion of $160,000 from Maharaj's relatives in Trinidad. Butler arranged this meeting for October 16, 1986, using the pretext of a business meeting with some Bahamian individuals named Dames and Ellis, who were interested in importing and exporting certain products. Butler arranged to use Dames' suite at the hotel. Butler stated that Maharaj made it clear that he should not tell Moo Young that he would be at the meeting.
According to Butler, Maharaj wanted to (1) extract a confession of fraudulent activity from Derrick Moo Young, (2) require Moo Young to issue two checks to repay him for the fraud, and (3) have Butler go to the bank with the checks to certify them, at which time Maharaj would allow Moo Young to leave upon hearing of the certification. Butler stated that Derrick Moo Young and, unexpectedly, Duane Moo Young, his son, appeared at the hotel room. Once inside, Maharaj appeared from behind a door with a gun and a small pillow. An argument broke out between Maharaj and Moo Young over the money owed. Maharaj shot Derrick Moo Young in the leg. At that time, Derrick Moo Young attempted to leave. Maharaj ordered Butler to tie up Duane Moo Young with immersion cords. Maharaj also ordered Butler to tie up Derrick Moo Young; however, before he could do so, Derrick Moo Young lunged at Maharaj. Maharaj fired three or four shots at Derrick Moo Young.
After shooting Derrick Moo Young, Maharaj questioned Duane Moo Young regarding the money. During this time, Derrick Moo Young crawled out the door and into the hallway. Maharaj shot him and pulled him back into the room. Shortly thereafter, Duane Moo Young broke loose and hurled himself at Maharaj, but Butler held him back. Then Maharaj took Duane Moo Young to the second floor of the suite where he questioned him again. Later, Butler heard one shot. Maharaj came downstairs and both he and Butler left the room. They both waited in the car in front of the hotel for Dames.
Sometime later, Butler met with Dames and Ellis, the two men he used to lure Moo Young to the hotel. They encouraged him to tell the police what he knew of the *788 murders. Later that day, Maharaj called Butler asking that he meet him at Denny's by the airport so they could make sure and get their stories straight. Butler called Detective Burmeister and told him what had transpired earlier that day in suite 1215 of the DuPont Plaza Hotel. The detective, along with another officer, drove Butler to Denny's to meet Maharaj and, at a prearranged signal, the detectives arrested Maharaj.
The State also presented the testimony of Tino Geddes, a journalist and native of Jamaica. He testified that in December, 1985, he met and began working for Elsee Carberry, the publisher of the Echo. Geddes stated that, while working for Carberry, he met Maharaj, and that he and Carberry went to Maharaj's home to discuss an article which Maharaj wanted the Echo to publish concerning Derrick Moo Young. Geddes stated that Carberry agreed to publish the article for $400. The article was published in the May 2, 1986, edition of the Echo and detailed the background of a civil suit filed against Derrick Moo Young by Maharaj's wife.
Geddes further testified that, because of the Echo's subsequent favorable coverage of Derrick Moo Young, Maharaj became hostile towards Carberry. Geddes stated that Maharaj purchased exotic weapons and camouflage uniforms and that, on several occasions, he and Maharaj had tried to harm Carberry. On one occasion, Maharaj had Geddes meet him at the bar of the DuPont Plaza Hotel; then he took him to a hotel room. Maharaj had a light-colored automatic pistol and a glove on one hand. Maharaj told Geddes to call and lure Carberry and Moo Young to the hotel room. Fortunately, Geddes was unable to get either Carberry or Moo Young to come to the hotel room.
The State also presented Elsee Carberry, the publisher of The Caribbean Echo. Carberry testified that he knew both Maharaj and Derrick Moo Young before his paper started publishing the articles. Carberry stated that he was approached by Maharaj's accountant, George Bell, who requested that he publish a front-page article about Moo Young. Carberry refused this request until he met with Maharaj. A meeting was arranged and Carberry was provided documentation for the article Carberry testified that Maharaj told him that Moo Young stole money from him and that he had documents to prove it. They agreed on a center spread and Maharaj paid $400 to have the article published.
Carberry testified that, after the first article, Maharaj wanted him to do a weekly article on Moo Young. Carberry refused and Maharaj attempted to buy The Caribbean Echo. When this failed, Carberry learned that Maharaj was starting his own newspaper. Shortly thereafter, Carberry was contacted by Derrick Moo Young, who wanted to present his side of the story. Carberry met with Moo Young, who provided documentation to refute Maharaj's allegations. Carberry then began his own investigation and began publishing articles unfavorable to Maharaj. These articles were printed on June 20, June 27, July 18, July 25, and October 10, 1986.
On July 5 an article was published to inform the readership that the Echo could not be bribed. This statement was printed in response to Maharaj's attempt to bribe Carberry. The July 18 and 25 articles charged Maharaj with taking money illegally out of Trinidad. The October 10 article accused Maharaj of forging a $243,000 check and explained that Moo Young was filing a lawsuit against Maharaj based on the forged check. During this period of time, Maharaj severed his relationship with Carberry.
The State presented other corroborating evidence concerning the events that took place at the DuPont Plaza Hotel. The maid assigned to this room testified that she cleaned the room in the early morning of October 16, 1986, and, upon entering it, found that it had not been used the previous evening. She also explained that, when she left the room, it was in perfect order, including the fact that the "Do Not Disturb" sign was on the inside of the door. At 12:15 p.m., she and her boss were asked to check the room. They attempted to enter the room but were unable to do so *789 because it was locked from the inside and, consequently, the master key would not work. She explained that the room could not be locked from the inside unless someone was in the room. Ten minutes later, she returned with a security guard, and they noticed that the "Do Not Disturb" sign was hanging on the doorknob. This time when she tried the master key, it worked; she opened the door and, upon entering the room, noticed that the furniture had been moved and that there were two bodies.
A police fingerprint expert testified that he found Maharaj's prints on: (1) the "Do Not Disturb" sign attached to the exterior doorknob of suite 1215; (2) the exterior surface of the entrance door; (3) the outer surface of the downstairs bathroom; (4) the top surface of the desk; (5) an empty soda can; (6) the telephone receiver; (7) the top of the television set; (8) a glass table top; (9) a plastic cup; (10) the Miami News newspaper; (11) a U.S.A. Today newspaper; and (12) torn packages that held immersion heaters. Butler's prints were also found on a plastic glass, the telephone, the desk, the front door, and the television set.
The State presented a firearms expert, who examined the spent projectiles and casings. The expert testified that the eight bullets fired were from a pre-1976 Smith & Wesson model 39, a nine-millimeter semiautomatic pistol with a serial number under 270000. Evidence in the record established that Maharaj owned a Smith & Wesson nine-millimeter pistol, having a serial number of A235464.
The State also presented the testimony of the medical examiner, who stated that Derrick Moo Young had six gunshot wounds, the most serious of which entered the right side of the chest and exited the lower back. There was only one gunshot wound in Duane Moo Young, and it entered the left side of the face and exited the right side of the neck, having been fired at close range within up to six inches between the wound and the barrel. The medical examiner found that this wound was consistent with Moo Young's kneeling or sitting with his head close to and facing the wall of the room.
During the course of the State's case, the chief judge of the criminal division announced that the judge who had been presiding over the trial would not be able to continue. Counsel for Maharaj stated that he would make no motion for mistrial. The newly assigned judge questioned Maharaj as to whether he desired a mistrial, to which Maharaj responded that he wished to proceed. The new trial judge certified that he had read the testimony of the previous witnesses and proceeded with the trial.
The defense did not present any witnesses in the guilt phase of the trial. After deliberations, the jury found Maharaj guilty as to each of the offenses charged except armed burglary and aggravated assault.
In the penalty phase, the State presented the testimony of the medical examiner, who described the nature of the wounds of each victim and explained the pain and effect of such wounds. Maharaj presented character witnesses including: (1) a congressman, who testified concerning Maharaj's character for truthfulness, honesty, and nonviolence; (2) his civil lawyer, who testified that he was hired to litigate the claims against Derrick Moo Young and that these claims had a substantial chance of prevailing prior to the victims' deaths; (3) a retired judge from Trinidad, who testified that he had known Maharaj for forty years, that he was not a violent person, and that he was an individual who donated money to charitable causes; and (4) a doctor from Trinidad, who stated that he had known Maharaj for over forty years and knew that he was not prone to violence. Maharaj testified in his own behalf. He spoke about his background and explained how Moo Young's companies had cheated him. Maharaj denied that he murdered either Derrick or Duane Moo Young and asked the jury to spare his life so that he could establish his innocence. He also prepared a letter to the jury outlining his numerous charitable gifts over the years.
After argument by counsel, the jury returned an advisory sentence as to the murder *790 of Derrick Moo Young of life imprisonment by a six-to-six vote, and, as to the murder of Duane Moo Young, the jury voted seven to five in favor of the death penalty.

Guilt Phase
In the guilt phase of the trial, Maharaj asserts that the trial judge erred in: (1) permitting the State to introduce prejudicial newspaper articles accusing him of committing various crimes; (2) permitting the State to elicit testimony from one of its witnesses about an attempt to murder an individual unrelated to this incident; (3) failing to apprise Maharaj in a legally adequate manner of the effects of a mistrial; (4) permitting the State to elicit from police officers the fact that several months prior to the murders Maharaj had an assortment of weaponry in the trunk of his automobile, none of which was illegal to possess or relevant to the charged offenses; and (5) excluding evidence that Butler failed his polygraph test when such evidence related to Butler's credibility.
The first claim concerns the admission into evidence of a series of newspaper articles from The Caribbean Echo by the State. The trial judge denied Maharaj's pretrial motion in limine related to these articles. At trial, Maharaj failed to object when the articles were presented and admitted into evidence. Consequently, we find that he did not preserve the issue for appellate review. See Phillips v. State, 476 So.2d 194 (Fla. 1985). Even assuming a proper objection had been made, we find that the articles were relevant to show Maharaj's motivation in harming Derrick Moo Young. Section 90.404(2)(a), Fla. Stat. (1987); Craig v. State, 510 So.2d 857 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988); Heiney v. State, 447 So.2d 210 (Fla.), cert. denied, 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984); Herzog v. State, 439 So.2d 1372 (Fla. 1983). Given the circumstances surrounding this cause, the articles were relevant to establish Maharaj's motivation and intent.
In his second claim, Maharaj alleges that the State erroneously presented collateral issues at trial through Tino Geddes' testimony, specifically, Geddes' testimony regarding Maharaj's attempt to run Elsee Carberry off the road. Maharaj argues that this testimony is not sufficiently similar to the facts of the charged offenses to bring it within the purview of section 90.404(2), Florida Statutes (1987),[2] nor was the statutorily required ten-day notice given by the State. Finally, Maharaj claims that this evidence's prejudicial effect outweighs its probative value, contrary to section 90.403, Florida Statutes (1987). We disagree. Counsel failed to object when Geddes' testimony was introduced at trial; consequently, this issue has not been preserved for review. See Herzog.
With regard to the third claim, concerning the change of the trial judge, we find no error. The record indicates that Maharaj expressly agreed to proceed with the second judge and that his counsel stated he would not move for a mistrial. Therefore, this claim is without merit.
We find that the remaining claims are without merit and need no further discussion. Furthermore, we conclude that the *791 evidence is sufficient to sustain the convictions of each of the offenses for which Maharaj was found guilty.

Penalty Phase
In imposing the death sentence for the murder of Duane Moo Young, the trial judge found the following aggravating circumstances: (1) Maharaj was convicted of another capital felony or of a felony involving the use of or threat of violence to a person[3] (this finding was based on Maharaj's contemporaneous convictions for the murder and kidnapping of Derrick Moo Young); (2) the capital felony was committed while Maharaj was engaged or was an accomplice in the commission or the attempt to commit kidnapping;[4] (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;[5] (4) the capital felony was especially heinous, atrocious, or cruel;[6] and (5) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.[7] As a mitigating factor, the trial judge found that Maharaj had no significant history of prior criminal activity.[8]
Maharaj raises six claims in the sentencing phase, asserting that the trial judge erred in: (1) sentencing him to death without taking into account the fact that Neville Butler, who testified for the State, was never charged; (2) failing to confine the State's cross-examination in the penalty phase to matters relating to aggravating and mitigating circumstances; (3) allowing the State to comment to the jury regarding the advisory role of the jury in the sentencing phase; (4) finding that the murder of Duane Moo Young was committed in an especially heinous, atrocious, or cruel manner; (5) finding that the murder of Duane Moo Young was committed in a cold, calculated, and premeditated manner without any pretense of legal or moral justification; and (6) finding that the murder of Duane Moo Young was committed for the purpose of avoiding or preventing a lawful arrest.
With regard to the first claim, regarding Neville Butler, the jury was well aware of Butler's participation in the crime. It is clear from the record that the initiator and perpetrator of the two murders was Krishna Maharaj. Given the circumstances of this case, we find this claim to be without merit. We also find the second and third claims to be without merit.
We next consider the validity of the aggravating factors as contained in claims four, five, and six. Here, we agree with Maharaj that the evidence in this case does not sustain a finding that the murder of Duane Moo Young was committed in an especially heinous, atrocious, or cruel manner, as it has been defined by this court in Lewis v. State, 398 So.2d 432, 438 (Fla. 1981), and McKinney v. State, 579 So.2d 80, 84 (Fla. 1991). However, we find that this record supports the aggravating circumstances that the murder was committed in a cold, calculated, and premeditated manner[9] and that it was committed for the purpose of avoiding or preventing a lawful arrest.[10] We hold that the improper use of *792 the aggravating circumstance of heinous, atrocious, or cruel would not make any difference in the sentence imposed, given the other aggravating and mitigating circumstances in the record in this case. Green v. State, 583 So.2d 647 (Fla. 1991); Holton v. State, 573 So.2d 284 (Fla. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991); Hill v. State, 515 So.2d 176 (Fla. 1987), cert. denied, 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988); Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988); Bassett v. State, 449 So.2d 803 (Fla. 1984); Brown v. State, 381 So.2d 690 (Fla. 1980), cert. denied, 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981).
Accordingly, for the reasons expressed, we affirm the convictions and sentences, including the sentence of death for the murder of Duane Moo Young.
It is so ordered.
SHAW, C.J., and OVERTON and GRIMES, JJ., concur.
BARKETT, J., concurs in result only.
KOGAN, J., concurs with conviction, but concurs in result only as to sentence.
McDONALD, J., concurs with conviction, but dissents from sentence.
NOTES
[1] Art. V, § 3(b)(1), Fla. Const.
[2] Section 90.404(2), Florida Statutes (1987), reads as follows:

(a) Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.
(b)1. When the state in a criminal action intends to offer evidence of other criminal offenses under paragraph (a), no fewer than 10 days before trial, the state shall furnish to the accused a written statement of the acts or offenses it intends to offer, describing them with the particularity required of an indictment or information. No notice is required for evidence of offenses used for impeachment or on rebuttal.
2. When the evidence is admitted, the court shall, if requested, charge the jury on the limited purpose for which the evidence is received and is to be considered. After the close of the evidence, the jury shall be instructed on the limited purpose for which the evidence was received and that the defendant cannot be convicted for a charge not included in the indictment or information.
[3] § 921.141(5)(b), Fla. Stat. (1987).
[4] § 921.141(5)(d), Fla. Stat. (1987).
[5] § 921.141(5)(e), Fla. Stat. (1987).
[6] § 921.141(5)(h), Fla. Stat. (1987).
[7] § 921.141(5)(i), Fla. Stat. (1987).
[8] § 921.141(6)(a), Fla. Stat. (1987).
[9] Hardwick v. State, 521 So.2d 1071 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 185, 102 L.Ed.2d 154 (1988); Stano v. State, 460 So.2d 890 (Fla. 1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 863 (1985); Eutzy v. State, 458 So.2d 755 (Fla. 1984), cert. denied, 471 U.S. 1045, 105 S.Ct. 2062, 85 L.Ed.2d 336 (1985); Gorham v. State, 454 So.2d 556 (Fla. 1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 941, 83 L.Ed.2d 953 (1985); Troedel v. State, 462 So.2d 392 (Fla. 1984), aff'd, 828 F.2d 670 (11th Cir.1987); Squires v. State, 450 So.2d 208 (Fla.), cert. denied, 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 204 (1984).
[10] Neville Butler testified that he asked Maharaj to "leave [Duane Moo Young] alone," to which Maharaj responded, "[O]nly he knows about this, and the two of you know about this and I have to kill him." See Swafford v. State, 533 So.2d 270 (Fla. 1988), cert. denied, 489 U.S. 1100, 109 S.Ct. 1578, 103 L.Ed.2d 944 (1989); Correll v. State, 523 So.2d 562 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 152 (1988); Herring v. State, 446 So.2d 1049 (Fla.), cert. denied, 469 U.S. 989, 105 S.Ct. 396, 83 L.Ed.2d 330 (1984); Clark v. State, 443 So.2d 973 (Fla. 1983), cert. denied, 467 U.S. 1210, 104 S.Ct. 2400, 81 L.Ed.2d 356 (1984); Johnson v. State, 442 So.2d 185 (Fla. 1983), cert. denied, 466 U.S. 963, 104 S.Ct. 2182, 80 L.Ed.2d 563 (1984).