722 So.2d 177 (1998)
Charles D. DONALDSON, Appellant,
v.
STATE of Florida, Appellee.
No. 88205.
Supreme Court of Florida.
April 30, 1998.
Rehearing Denied December 17, 1998.
*179 Nancy C. Daniels, Public Defender, and Chet Kaufman, Assistant Public Defender, Second Judicial Circuit, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General, and Barbara J. Yates, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Charles D. Donaldson. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed, we affirm Donaldson's convictions but reverse his sentence of death and remand this case to the trial court for a new penalty-phase proceeding.

MATERIAL FACTS
The State's case against Donaldson was based primarily upon the testimony of two witnesses allegedly present at the time of the murders, Joseph Wengert and William Purcell Straham. On July 9, 1994, Donaldson and three others, Ruben Cisneros, Joseph *180 Wengert, and William Purcell Straham, sat in Donaldson's home for most of the day drinking alcoholic beverages. Donaldson was a street level drug dealer involved in selling crack cocaine. From the record, in fact, it appears that virtually everyone, including the victims and the State's witnesses, were involved in illicit drug activity. At one point that evening, Donaldson called thirteen-year-old Lawanda Latisha Campbell, who was at a friend's house with fifteen-yearold Donnta Lamar Head, and told her to "go stand in front of her daddy's house and that he would be by to shoot her." Campbell and Head then left the friend's house and walked to Donaldson's home.
In the meantime, Donaldson spoke on the telephone with Campbell's father, Tommy Gainer, and argued with him. Wengert took the phone from Donaldson and continued to argue with Gainer when the phone line suddenly went dead. At the same time, Campbell and Head arrived at Donaldson's home. Afraid he was about to be robbed by Campbell and Head, Donaldson ordered everyone to exit the house from the back door. Wengert testified that Cisneros then put a gun on Head, walked him inside and seated him in a two-seat wicker chair in the living room. Donaldson then ordered Cisneros and Wengert to retrieve Campbell who had run to the corner and was hiding behind a car. She, too, was forced into the house at gunpoint and seated in the wicker chair with Head. Although Wengert testified that everyone was armed with a firearm, Straham testified to the contrary, that he did not see any guns during the entire episode. Head and Campbell were not armed.
Apparently, Donaldson had been the victim of several prior attempted robberies, at least one of which involved Campbell and Head just a few days before the murders. Wengert testified that he, Donaldson, and Cisneros proceeded to interrogate Head and Campbell about the prior robberies, during which time Donaldson held a 9-mm handgun on his lap and Cisneros and Wengert held two firearms eacha .22 caliber and a .25 caliber automatic. According to Wengert, Campbell looked scared and asked if she was going to die. Both he and Donaldson assured her that she was not. Straham sat in the dining room drinking and watching a video, and recalled hearing Donaldson and Wengert talking to the victims about prior robberies but did not see Donaldson with a gun.
Campbell was allowed to leave the room to use the bathroom, and afterward she sat in the dining room talking to Straham. At that point Donaldson said, "I don't care about that bitch," to which Cisneros responded, "Well if you don't care about that bitch, that means that you don't care what I do." He then struck Campbell, knocking her down, and kicked her. Head and Campbell again asked if they were going to die, and everyone, including Donaldson, answered no.
According to Wengert, Donaldson's pager beeped and, when Donaldson returned the call, he told the person on the other end to sit tight as he might be needed for a favor. Cisneros and Straham were then sent by Donaldson to pick up that person and returned later with Joseph Sykosky. Wengert testified that before Sykosky arrived, Donaldson had asked him to kill the victims. However, Wengert thought Donaldson was kidding. Apparently, Sykosky owed Donaldson quite a bit of money for drugs. Wengert claims Donaldson told Sykosky that "if he did the job and done it right, that his debt would be clean." Sykosky asked Donaldson if these (indicating Head and Campbell) were the ones Donaldson wanted him to "take care of." Donaldson said yes, handed Sykosky a gun, and told him to wait until Wengert increased the volume on the stereo. Sykosky then shot and killed the two victims in rapid succession. Straham, who was in the other room and heard five gunshots, testified that he did not hear anyone order Sykosky to kill the victims and did not see the shooting. He did notice, however, a shocked or stunned look on Donaldson's face after the shootings.
Afterwards, the victims' bodies were placed in the trunk of Donaldson's car and Donaldson, Cisneros, and Wengert left to dispose of the bodies and the contents of the trunk. Upon their return, they all cleaned the house and Donaldson told Sykosky to dispose of the murder weapon. The weapon was never found. At trial, a firearms expert *181 testified that the victims were killed with a 9 by 18 Makarov. Subsequent DNA analysis on blood found in Donaldson's house and the trunk of his car was consistent with that of the victims.
The defense did not present any witnesses. After hearing all of the evidence, the jury found Donaldson guilty of two counts of first degree murder, two counts of kidnapping with a firearm, and two counts of aggravated child abuse with a firearm. The jury recommended death by a vote of eight to four for the murder of Head and by a vote of nine to three for the murder of Campbell. The judge followed the jury's recommendation, finding five aggravating circumstances for each victim,[1] no statutory mitigating circumstances, and several nonstatutory mitigating circumstances.[2] The trial court sentenced Donaldson to death for the murders and sentenced him to life imprisonment for the kidnapping charges and thirty years imprisonment for the aggravated child abuse charges.

APPEAL
Donaldson raises ten issues on appeal.[3]

Waiver of Right to Testify
As his first claim, Donaldson argues the trial judge abused his discretion in denying his request to testify. The record reveals that during the guilt phase of the trial, before the defense rested and after fully being informed by the trial judge of his right to testify, Donaldson knowingly and voluntarily waived his right to testify. Thereafter, the case was fully argued to the jury by both sides. However, before the judge instructed the jury, defense counsel informed the judge that Donaldson now wanted to testify. The court refused the request.
The decision to reopen a case lies within the discretion of the trial court and will not be disturbed on appellate review absent an abuse of discretion. Delgado v. State, 573 So.2d 83, 86 (Fla. 2d DCA 1990). Where the case is not technically closed (i.e., counsel have not begun closing argument and the case has not been submitted to the jury), the denial of a defendant's motion to reopen the case will be reversed if the motion was timely and a proper showing has been made as to why the evidence was omitted. Steffanos v. State, 80 Fla. 309, 86 So. 204 (1920) (holding that the case should be reopened where "the cause ha[s] not proceeded so far *182 that the ends of justice would [be] defeated, or the orderly process of the court disturbed"); Delgado, 573 So.2d at 86 (finding abuse of discretion where motion timely and refusal to reopen deprived jury of significant evidence); State v. Ellis, 491 So.2d 1296, 1297 (Fla. 3d DCA 1986) (reversing trial court order denying State's motion to reopen suppression hearing where hearing not technically closed and ends of justice served by admission of crucial evidence previously omitted).
In this case Donaldson asserted his desire to testify after initially explicitly refusing to do so, and after the close of all of the evidence and the completion of closing arguments by counsel for both sides. It was not until the judge was about to instruct the jury on the law that defense counsel informed the court, without elaboration, of Donaldson's change of mind. On these facts, with both sides having already presented their theories of the case and their views of the evidence to the jury, we cannot find that the trial court abused its discretion.

Sufficiency of the Evidence
As for his second claim, Donaldson argues the evidence is insufficient to sustain his convictions. His argument is twofold. First, Donaldson claims that because the State's primary witnesses, Straham and Wengert, offered contradictory evidence as to the essential elements of the charged crimes, his convictions cannot stand.[4] We disagree. "A judgment of conviction comes to this Court with a presumption of correctness and a defendant's claim of insufficiency of the evidence cannot prevail where there is substantial competent evidence to support the verdict and judgment." Terry v. State, 668 So.2d 954, 964 (Fla.1996). The fact that the evidence is contradictory does not warrant a judgment of acquittal since the weight of the evidence and the witnesses' credibility are questions solely for the jury. Davis v. State, 425 So.2d 654, 655 (Fla. 5th DCA 1983); see generally Lynch v. State, 293 So.2d 44, 45 (Fla.1974) (holding that where reasonable minds may differ as to proof of ultimate fact, courts should submit case to jury). It is not this Court's function to retry a case or reweigh conflicting evidence submitted to the trier of fact. Tibbs v. State, 397 So.2d 1120, 1123 (Fla.1981), affirmed, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).
We find that the record contains competent, substantial evidence which supports Donaldson's convictions. As to kidnapping, the evidence reveals that the victims were forced into Donaldson's house at gunpoint; held there against their will; interrogated for almost two hours; and eventually killed. There was evidence presented that these acts were done at Donaldson's direction. As to aggravated child abuse, the evidence indicated that Donaldson and his cohorts forcefully interrogated and abused the victims for an hour and a half; Campbell was beaten in front of Head, and both children repeatedly asked if they were going to die, indicating some fear for their lives.
The record also reveals sufficient evidence by which to sustain Donaldson's conviction of first-degree murder under a theory of either felony murder or premeditated murder.[5] Felony murder was established by evidence that Donaldson caused the death of the victims while committing kidnapping or aggravated child abuse, both of which are enumerated felonies under section 782.04(1)(a)2, Florida Statutes (1993). Likewise, Donaldson's conviction for premeditated murder was shown by evidence that Donaldson told Campbell earlier that evening to stand outside and he would drive by to shoot her; that he later asked both Wengert and Sykosky to kill the victims; and that Sykosky *183 did in fact kill the victims, thus indicating Donaldson's deliberation and intent to kill.
As a second part of Donaldson's claim, he argues the dual convictions of firstdegree murder and aggravated child abuse based on the same core act (shooting the victims) unconstitutionally violates his rights against double jeopardy. Donaldson argues that because he is not culpable for Cisneros' independent act of striking Campbell, the only remaining battery is the single act of shooting the victims which is the same act relied upon by the State in proving firstdegree murder. We find this claim to be without merit. "Legislative intent is the polestar that guides our analysis in double jeopardy issues." State v. Anderson, 695 So.2d 309, 311 (Fla.1997). In State v. Smith, 547 So.2d 613 (Fla.1989), we recognized the legislative intent to impose multiple punishments for separate offenses even if the offenses are based on only one act. Id. at 616. Double jeopardy is not implicated as long as the criminal offenses for which Donaldson was charged contain statutory elements which the others do not, Smith, 547 So.2d at 613, and the charged offenses are not degree variants of each other, Anderson.
Here, the State charged defendant with aggravated child abuse based on two theories: aggravated battery on a child and willful torture of a child.[6] Based on the two theories relied upon by the State, and the evidence, the jury could have found aggravated child abuse from evidence of willful abuse and torture without resort to aggravated battery.
Accordingly, we find the evidence sufficient to sustain Donaldson's convictions. However, for reasons that follow, we reverse Donaldson's sentence and remand this case to the trial court for a new penalty-phase proceeding.

PENALTY PHASE
During the penalty phase of the trial, the State devoted virtually its entire case to evidence by numerous witnesses relating to the factual circumstances of a 1991 felony conviction by which Donaldson was convicted of accessory after the fact to a second-degree murder. The State successfully prosecuted and convicted another person, Schrolf Barnes, for the commission of the murder, and utilized Donaldson's assistance in securing the conviction. Evidence presented at the penalty phase consisted of: (1) Don Vinson from the Okaloosa County Sheriff's Office who investigated the prior murder and interviewed the witnesses; (2) Herman Hicks, one of the males involved in the altercation and a friend of the victim; (3) the taped statement of James Kasten, another one of the males who was involved in the altercation but unavailable to testify, who claimed that Schrolf Barnes was the person who struck the victim with the bat; (4) Wilford Moran, one of the investigators, who testified solely to explain Kasten's unavailability; (5) Kasten's deposition testimony which detailed the events leading up to the incident and identified Barnes as the killer; (6) Steve Ashmore, another investigator, who testified as to various statements made by Donaldson, his brother Mario, and Barnes; (7) Donaldson's taped 1991 interview in which he explained the circumstance surrounding the beating; and (8) David E. Fleet, the assistant state attorney who prosecuted the murder case, who explained the State's decision to dismiss a murder charge against Donaldson and offer him a plea to a lesser charge in exchange for his testimony against Barnes. In addition, the State submitted taped and handwritten statements of one of the witnesses to the prior felony, a photograph of Donaldson as he appeared in 1991, a portion of the autopsy report describing the prior murder victim's injuries, and copies of the judgment, plea and scoresheet for the prior conviction. Hence, the entire focus of the *184 State's case at the penalty phase was on the details of the 1991 murder for which Barnes was prosecuted and convicted.[7]

Accessory after the Fact
Donaldson contends that the trial court erred in admitting and considering evidence of his prior conviction of accessory after the fact as a prior violent felony under section 921.141(5)(b), Florida Statutes (1993).[8] We agree.
Accessory after the fact is defined as:
Whoever ... maintains or assists the principal or accessory before the fact, or gives the offender any other aid, knowing that he had committed a felony or been accessory thereto before the fact, with intent that he shall avoid or escape detection, arrest, trial or punishment....
§ 777.03, Fla. Stat. (1993). We have explicitly held that by legal definition, a person convicted as a principal to a crime cannot also be convicted as an accessory after the fact to the same crime, since these two offenses are mutually exclusive. Staten v. State, 519 So.2d 622, 625 (Fla.1988). We explained in Staten:
Although Florida has abolished the common law distinctions between principals, aiders and abettors, and accessories before the fact, accessory after the fact remains as a separate offense. The accessory after the fact is no longer treated as a party to the crime but has come to be recognized as the actor in a separate and independent crime, obstruction of justice. At common law, all parties to a crime were equally guilty and subject to the same punishment. Under our modern codification, however, an accessory after the fact is guilty of a third-degree felony regardless of the gravity of the substantive offense committed. Thus, the culpability of the accessory after the fact is substantially different from that of a principal, reflecting an intent to punish as an accessory after the fact only those persons who have had no part in causing the felony itself but have merely hindered the due course of justice.

Id. at 626 (citation and footnote omitted) (emphasis added). In other words, the very definition of the offense precludes an accessory after the fact being convicted as a principal to the underlying crime, regardless of the gravity of the underlying crime. Accordingly, we find as a matter of law that a conviction for accessory after the fact to a crime of violence may not be used as a vehicle to implicate the defendant as a principal in the prior underlying crime of violence under section 921.141(5)(b).
It is axiomatic that penal statutes must be strictly construed. Cabal v. State, 678 So.2d 315 (Fla.1996); Merck v. State, 664 So.2d 939 (Fla.1995) (resentencing required where State improperly introduced juvenile adjudication as evidence of prior violent felony conviction); Trotter v. State, 576 So.2d 691 (Fla.1990). Accordingly, we conclude that while section 921.141(5)(b) permits the State to present evidence of a prior violent felony conviction as an aggravating circumstance, it specifically limits the evidence to that of a violent crime for which the defendant is actually convicted. Dougan v. State, 470 So.2d 697, 701 (Fla.1985) (holding that plain language of statute precludes considering mere arrests or accusations as aggravating factors), cert. denied, 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 900 (1986).
Here, however, the State was permitted over objection to overstep that boundary by presenting evidence of Donaldson's involvement as a principal in a violent crime for which he was not charged or convicted as a principal. The State successfully prosecuted another person for the second-degree murder in question and expressly dismissed the charge of principal to second-degree murder against Donaldson. Indeed, the *185 State expressly agreed with Donaldson, in exchange for his evidence against Barnes, to allow Donaldson to plead guilty to the entirely separate and lesser crime of accessory after the fact.
In effect, the State was allowed in this case to rescind its 1991 agreement and decision not to prosecute Donaldson as a principal, by now attempting to prove here that Donaldson was actually a principal in the 1991 murder. More importantly, the State was allowed to mislead the jury into believing that Donaldson had been convicted of a prior violent felony as a principal to murder when in fact he had only been convicted of accessory after the fact, an offense wholly independent and distinct from the underlying crime of murder. See Staten. In its closing argument during the penalty phase of the trial, the State specifically asserted that Donaldson was a principal to the 1991 murder:
Ladies and gentlemen, there's no question in this case under the facts and circumstances of that previous conviction that Charles Donaldson was a murderer long before you ever heard of him or saw him. The facts and circumstances of the murder of Paul Mahugh are clear that Charles Donaldson was at the very least a principal. The judge told you and you're going to still have your law regarding principal in the jury room with you if you want to look at it again, but if he helped another person of persons commit or attempt to commit a crime he is a principal and must be treated as if he had done all of the things the other person or persons did if the defendant had a conscious intent that the criminal act be done and the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually commit or attempt to commit the crime. In this case even if you take the defendant's version of the murder of Paul Mahugh at face value ... he is at the very least a principal to the murder....
Hence, the State essentially was allowed to retry and convict Donaldson as a principal for a crime it had explicitly agreed not to pursue against Donaldson in 1991.
Nonetheless, the State asks us to find the error harmless under the circumstances. This we cannot do. Unquestionably, the State's evidence relating to Donaldson's guilt of second-degree murder was the feature of the penalty phase proceeding. Further, the State's emphasis during its closing argument, i.e., depicting Donaldson as a principal to murder, a position contrary to that which the State had taken in 1991, obviously tainted the validity of the jury's recommendation and cannot be said to be harmless error. See Bertolotti v. State, 476 So.2d 130, 133 (Fla.1985) (vacating death sentence where prosecutor's egregious comment during closing argument tainted validity of jury's recommendation and warranted new penaltyphase trial). In addition, the error was magnified by the State's improper argument to the jury that if it found that Donaldson was convicted of a prior violent felony then it could consider that fact as a second and independent aggravating factor, the first being Donaldson's contemporaneous conviction of a capital felony, contrary to section 921.141(5)(b). Accordingly, we cannot find the error harmless under the circumstances.[9]

REMAINING ISSUES
Although we are ordering a new penalty phase hearing based on the trial court's error in admitting evidence of Donaldson's prior conviction of accessory after the fact, we find it necessary to discuss some of Donaldson's remaining penalty phase issues because of the possibility of their recurrence.

Admissibility of Deposition Testimony
Donaldson contends that the trial court erred during the sentencing hearing by admitting the deposition transcript of co-felon Ruben Cisneros, who did not testify at the guilt or penalty phase of the trial and who, during the deposition, admitted to lying about the events in this case. We agree. Generally, depositions taken for pre-trial discovery *186 purposes are inadmissible in criminal proceedings as substantive evidence. State v. Green, 667 So.2d 756, 760-761 (Fla.1995). In Engle v. State, 438 So.2d 803 (Fla.1983), we stated:
The requirements of due process of law apply to all three phases of a capital case in the trial court: 1) The trial in which the guilt or innocence of the defendant is determined; 2) the penalty phase before the jury; and 3) the final sentencing process by the judge. Presnell v. Georgia, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978); Gardner v. Florida; Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979). Although defendant has no substantive right to a particular sentence within the range authorized by statute, sentencing is a critical stage of the criminal proceeding.
The sixth amendment right of an accused to confront the witnesses against him is a fundamental right which is made obligatory on the states by the due process of law clause of the fourteenth amendment to the United States Constitution. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The primary interest secured by, and the major reason underlying the confrontation clause, is the right of cross-examination. Pointer v. Texas. This right of confrontation protected by cross-examination is a right that has been applied to the sentencing process. Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967).
Id. at 813-14; accord Gardner v. State, 480 So.2d 91 (Fla.1985) (finding error where trial court allowed jury to hear accomplice's statements incriminating defendant). We find it was error for the trial court to admit and consider Cisneros' deposition testimony where, as here, he did not testify in either the guilt or penalty phase of the trial.

HAC
Next, as to claim five, Donaldson argues the trial court erred in finding the murder heinous, atrocious, and cruel (HAC) under section 921.141(5)(h).[10] In State v. Dixon, 283 So.2d 1 (1973), this Court stated:
It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital feloniesthe conscienceless or pitiless crime which is unnecessarily torturous to the victim.
Id. at 9. Stated another way, the heinous, atrocious or cruel aggravator "is proper only in torturous murdersthose that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another." Cheshire v. State, 568 So.2d 908, 912 (Fla.1990).
On the other hand, we have held that "an instantaneous or near-instantaneous death by gunfire" does not satisfy the HAC aggravating factor. Robinson v. State, 574 So.2d 108, 112 (Fla.1991); see also Maharaj v. State, 597 So.2d 786 (Fla.1992) (rejecting HAC aggravator despite execution-style killing of victim after interrogating him). "Execution style killings are not generally HAC unless the state has presented other evidence to show some physical or mental torture of the victim." Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996), cert. denied, ___ U.S. ___, 118 S.Ct. 86, 139 L.Ed.2d 43 (1997). Indeed, we have rejected application of the HAC aggravator where the evidence indicated that the defendant had not intended to *187 cause the victim any prolonged suffering and, in fact, had assured the victims that they would not be killed. See Robinson, 574 So.2d at 112..
Here, the trial judge relied on the fact the victims were forced into the house at gunpoint, kept there against their will for several hours while Donaldson and his accomplices interrogated them. Further, the trial court speculated that the victims undoubtedly heard Donaldson order Sykosky to kill them. In contrast, the evidence reveals that the victims were assured repeatedly that they were not going to die and the murders occurred quickly. As in Robinson, the evidence in this case does not establish that the defendant intended or that the victims suffered an acute awareness of their impending deaths, or that Donaldson intended to cause them unnecessary pain or prolonged suffering. Mere speculation that the victims may have realized that Donaldson intended to do more than interrogate them is insufficient. See Hartley, 686 So.2d at 1324. Accordingly we find the evidence insufficient to establish the HAC aggravator as the murders in this case did not fall outside the norm of capital felonies.

CCP
Next, Donaldson argues that the trial court erred in finding these murders cold, calculated, and premeditated (CCP) despite evidence supporting a pretense of legal or moral justification.[11] He argues the evidence revealed that he lived in a constant state of siege and his family had to be surrounded constantly by bodyguards. We disagree. In Walls v. State, 641 So.2d 381 (Fla.1994), cert. denied, 513 U.S. 1130, 115 S.Ct. 943, 130 L.Ed.2d 887 (1995), we stated:
[A] pretense of moral or legal justification is any colorable claim based at least partly on uncontroverted and believable factual evidence or testimony that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide.
Thus, we have repeatedly rejected claims that the purely subjective beliefs of the defendant, without more, could establish a pretense of moral or legal justification. However, we have found such justification where some factual evidence or testimony supported a colorable though incomplete claim of self-defense, typically because the victim had threatened violence against the defendant at some recent point in the past. This has been true even where the only evidence to this effect was uncontroverted factual testimony of the defendant himself that nevertheless was consistent with the facts surrounding the murder.
Id. at 388 (citations omitted) (footnote omitted). Here, the trial court found that "under [no] stretch of the imagination" can these murders "be said to have been committed under any pretense of legal or moral justification." The evidence adduced at trial established that the victims were unarmed at the time they entered Donaldson's home. There was no evidence that Donaldson feared the victims or that the victims intended to rob him. Although some evidence indicates prior attacks and attempted robberies against Donaldson, most of it concerned acts by persons other than Campbell and Head. Thus, a reasonable fact-finder could conclude that the evidence does not support a pretense of legal or moral justification for these murders.[12]

*188 Murder Committed During Course of Felony

Donaldson also contests the sufficiency of the evidence to establish the aggravator that the murders were committed during the course of a kidnapping, one of the enumerated felonies under section 921.141(5)(d) of the Florida Statutes. We disagree. As stated above, the record reveals competent, substantial evidence to support Donaldson's conviction of kidnapping. Therefore, we find this aggravator amply supported by the record. Brown v. State, 473 So.2d 1260, 1267 (Fla.1985); White v. State, 403 So.2d 331 (Fla.1981).

Nonstatutory Mitigation
Initially, Donaldson claims that the trial court erred in refusing to give his special instructions on accomplice liability and disparate treatment. However, this Court has rejected similar claims in holding that a trial court "is required to give only the `catch-all' instruction on mitigating evidence and nothing more." James v. State, 695 So.2d 1229, 1236 (Fla.1997); see also Ferrell v. State, 653 So.2d 367, 370 (Fla.1995); Walls v. State, 641 So.2d 381, 389 (Fla.1994) ("The instruction on mitigating factors has been repeatedly upheld both in this Court and in the federal courts, and we reaffirm its validity today."). Thus, we find no error.
As to the merits of Donaldson's claim, he raises several arguments relating to certain nonstatutory mitigating evidence. First, he contends the trial court erred in refusing to admit evidence of the State's plea offer for life imprisonment.[13] We disagree. Under section 90.410 of Florida's Evidence Code, offers to plead guilty are not admissible in either criminal or civil cases. § 90.410, Fla. Stat. (1993); see also Reese v. State, 694 So.2d 678, 684 (Fla.1997) (holding offers to plead are not admissible by defense even where State opens the door to such issue); Bottoson v. State, 443 So.2d 962, 965 (Fla. 1983). Thus, evidence that the State offered Donaldson life imprisonment as part of a plea agreement is inadmissable and we find no error in the court's refusal to admit it.
Second, Donaldson claims that the trial court either failed to consider or attributed too little weight to certain evidence offered in mitigation. The issue is largely mooted by our remand for a new penalty phase. The trial court, during the penalty phase of a capital trial, is required to expressly find, consider and weigh in its written sentencing order all of the mitigating evidence urged by the defendant, both statutory and nonstatutory, which appears anywhere in the record. Ellis v. State, 622 So.2d 991 (Fla.1993). However, we also point out that "[b]ecause nonstatutory mitigating evidence is so individualized, the defense must share the burden and identify for the court the specific nonstatutory mitigating circumstances it is attempting to establish." Lucas v. State, 568 So.2d 18, 24 (Fla.1990). Because we are mandating a new sentencing proceeding before a new jury, we decline to further address this issue since the parties will have a new opportunity to present evidence to the court and jury.

Departure Sentence
As his final claim, Donaldson argues that the trial court erred in failing to attach contemporaneous written reasons for Donaldson's departure sentence on the noncapital convictions. We agree. Upon sentencing a defendant outside of the sentencing guidelines, *189 the trial court must attach to the sentencing order contemporaneous written reasons for the upward departure. See § 921.001(6), Fla. Stat. (1993) ("Any sentence imposed outside the range recommended by the guidelines must be explained in writing by the trial court judge."); Gibson v. State, 661 So.2d 288 (Fla.1995); Robertson v. State, 611 So.2d 1228, 1234 (Fla.1993). Where the trial judge fails to provide written reasons for the departure sentence, the appellate court must reverse with instructions to resentence the defendant in accordance with the sentencing guidelines without possibility of departure. See Owens v. State, 598 So.2d 64, 64-65 (Fla.1992); Pope v. State, 561 So.2d 554, 556 (Fla.1990). Here, the trial judge sentenced Donaldson to life imprisonment with a three-year minimum for the kidnapping charges and thirty years' imprisonment for aggravated child abuse to run concurrently with the life sentence. The scoresheet, however, reflects a maximum sentence of approximately twenty-seven years' imprisonment. Although the sentencing order was twice amended, no written departure reasons were filed with the initial sentencing order. Accordingly, upon resentencing, the trial court shall resentence Donaldson for the noncapital offenses within the sentencing guidelines without possibility of departure.
As for the remainder of Donaldson's penalty phase claims, they have been rendered moot by our disposition of this case.

CONCLUSION
Accordingly, we affirm Donaldson's convictions for two counts of first-degree murder, kidnapping and aggravated child abuse. However, based upon our rejection of the heinous, atrocious and cruel aggravator and on our conclusion that Donaldson's conviction of accessory after the fact may not be used as the vehicle with which to introduce the circumstances of the underlying substantive crime in satisfying section 921.141(5)(b), we reverse his sentences of death and remand this case to the trial court with instructions to hold a new penalty phase proceeding before a new jury in accord with this opinion.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, HARDING and ANSTEAD, JJ., concur.
WELLS, J., concurs in part and dissents in part with an opinion, in which GRIMES, Senior Justice, concurs.
WELLS, Justice, concurring in part and dissenting in part.
I concur that we must remand this case for a new penalty phase because the trial court erred in allowing the State to argue Donaldson's prior conviction of being an accessory after the fact to a second-degree murder as a prior violent felony. I conclude that such error was not harmless because I cannot say beyond a reasonable doubt that the error did not affect the jury's recommendation. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla. 1986).
I also agree, and the State concedes, that Donaldson must be resentenced within the guidelines for his noncapital convictions because the trial court failed to enter contemporaneously with sentencing any written findings for the guideline departure sentences. Owens v. State, 598 So.2d 64 (Fla. 1992).
I dissent from that portion of the majority's decision that holds that these murders were not heinous, atrocious, or cruel (HAC). The majority correctly acknowledges that execution-style murders resulting in instantaneous or near instantaneous death are not usually HAC unless there has been physical or mental torture of the victim, Henyard v. State, 689 So.2d 239, 254 (Fla.1996), cert. denied, ___ U.S. ___, 118 S.Ct. 130, 139 L.Ed.2d 80 (1997); Routly v. State, 440 So.2d 1257, 1265 (Fla.1983), yet dismisses the trial court's finding that the victims were acutely aware of their impending deaths as "speculation."
In an instantaneous death situation, fear and emotional strain may be considered as contributing to the heinous nature of the murder. James v. State, 695 So.2d 1229, 1235 (Fla.1997); Wyatt v. State, 641 So.2d 1336 (Fla.1994); Preston v. State, 607 So.2d 404, 410 (Fla.1992); Hitchcock v. State, 578 So.2d 685, 693 (Fla.1990). We have upheld the HAC aggravator where victims have *190 been murdered by gunshot and have died instantaneously but before being killed were subjected to agony over the prospect that death was soon to occur. Routly, 440 So.2d at 1265; Smith v. State, 424 So.2d 726 (Fla. 1982); Griffin v. State, 414 So.2d 1025 (Fla. 1982); Steinhorst v. State, 412 So.2d 332 (Fla.1982); White v. State, 403 So.2d 331 (Fla.1981); Knight v. State, 338 So.2d 201 (Fla.1976).
In its sentencing order, the trial court made the following findings regarding the HAC aggravator:
The murders were committed in an especially heinous, atrocious, or cruel manner. These two teenagers were kidnapped at gunpoint and held for several hours and interrogated extensively by the Defendant and his cohorts as both [Campbell] and [Head] asked on more than one occasion if they were "going to die." The testimony indicates without question that both victims were obviously in fear of dying at the hands of the Defendant for several hours before the arrival of the triggerman, Joseph Sykosky. We will never know the amount of fear and anxiety suffered by these two children when they witnessed the arrival of Joseph Sykosky, the Defendant handing him the gun, and the Defendant directing George Wengert to go turn on the stereo and then to turn it up louder. If the victims had suspicions earlier that they might die, as evidenced by their questions, "Are we going to die", certainly they knew from the time of Mr. Sykosky's arrival that he was there for the purpose of murdering them. While the evidence is not clear which child was shot first, it is abundantly clear that one child watched as their friend was executed with full knowledge and understanding that they would be next. Even though the deaths of these victims may have been quick rather than lingering, they were subjected to hours of terror and at least minutes of excruciating and heightened anguish and fear before their death. This aggravating circumstance has been proved beyond a reasonable doubt as to each count.
Contrary to the majority, I find that these findings are not based upon "speculation" but are supported by competent, substantial evidence. Moreover, I conclude that, based on these findings, the law supports the trial court's conclusion that the murders were especially heinous, atrocious, or cruel.
In this case, the record establishes the following. Before the day of the murders, Campbell and Head were involved in an attempted robbery of Donaldson. Although Donaldson suspected that the two were involved in the attempted robbery, Campbell and Head had no reason to know that Donaldson suspected them. On the day of the murders, Campbell and Head decided to go to Donaldson's house to try to obtain some drugs. They were kidnapped at gunpoint and interrogated about the attempted robbery.
At this time, the testimony indicates that Campbell at first did not answer any questions; she just sat there "looking scared [as if she were about] to start crying." She repeatedly asked everyone if she was going to die. The trial court properly inferred from the evidence that she may not have believed her captors when they told her she was not going to be killed. If she had believed what she was being told, she would not have repeatedly asked whether she was going to die. In fact, Wengert testified that when Donaldson told Campbell she would not die, he said it with "a serious look on his face like he went crazy or something." One possible inference is that Donaldson was teasing the victim with her own life.
At one point during her detention, Campbell was in the kitchen with Straham and Wengert when Wengert heard Donaldson say, "I don't care about that bitch." Cisneros replied, "Well, seeing that you don't care about that bitch, that means you don't care what I do." Cisneros then entered the kitchen and knocked Campbell out of her chair and kicked her.
When Sykosky arrived, he stood in front of the children, and Donaldson handed him his 9-mm handgun. Sykosky then asked, "Are these the ones you want me to do in?" At this time, Campbell and Head surely knew their fate. Donaldson responded positively by saying, "Kill them," but told Sykosky to *191 wait while Wengert turned on the stereo.[14] After Wengert returned from turning on the stereo, Donaldson instructed him to go back and turn it up louder. Then one child watched while the executioner killed the other, knowing that his or her execution would soon follow. As we said in Routly, I find that the terror and fear that the children must have felt throughout this abominable sequence of events "beyond description by the written word," Routly, 440 So.2d at 1265, because the victims undoubtedly agonized over the prospect that death was soon to occur.
The cases cited by the majority to reverse the HAC finding are factually inapposite. In Robinson v. State, 574 So.2d 108 (Fla.1991), the defendant abducted the victim, raped her, and shot her twice, killing her. In reversing the trial court's finding of HAC, we noted that there was no evidence that the victim "labored under the apprehension that she was to be murdered." As the trial court's order plainly shows, that was not the case here. In Hartley v. State, 686 So.2d 1316 (Fla.1996), the victim was abducted at gunpoint while he was selling crack cocaine from his vehicle, which was parked at an apartment complex. The following day, the victim was found shot to death in his vehicle. In reversing the trial court's finding of HAC, we noted that:
[T]here is no evidence that Hartley deliberately shot the victim to cause him unnecessary suffering. In fact, the evidence reflects that the murder was carried out quickly. Speculation that the victim may have realized that the defendants intended more than a robbery when forcing the victim to drive to the field is insufficient to support this aggravating factor.
Id. at 1323-24. The Hartley record was completely devoid of any evidence of the events leading up to the victim's death which would prove mental anguish. The instant record reflects more than mere "speculation" that the victims were acutely aware of their impending deaths.
I conclude that Henyard v. State, 689 So.2d 239, 254 (Fla.1996), cert. denied, ___ U.S. ___, 118 S.Ct. 130, 139 L.Ed.2d 80 (1997), supports the trial court's legal conclusion that the murders were especially heinous, atrocious, or cruel. In Henyard, the defendant and an accomplice abducted a woman and her two daughters, ages three and seven, from a Winn-Dixie Store. After raping the woman, the abductors shot her four times and left her for dead on the side of the road. The little girls were each executed with a single gunshot to the head. In affirming the trial court's finding of HAC we wrote:
In this case, the trial court found the [HAC] aggravating factor to be present based upon the entire sequence of events, including the fear and emotional trauma the children suffered during the episode culminating in their deaths....
In the instant case, it is clear that the trial court's conclusion was based upon the entire sequence of events, including the fear and emotional trauma the victims suffered during the episode that culminated in their deaths. Therefore, I would conclude that the record fully supports a finding that these murders were especially heinous, atrocious, or cruel.
GRIMES, Senior Justice, concurs.
NOTES
[1] (1) Donaldson was previously convicted of another capital offense (contemporaneous murder); (2) Donaldson was previously convicted of a felony involving violence (accessory after the fact); (3) the murders where committed while engaged in a kidnapping; (4) the murders were cold, calculated and premeditated; and (5) the murders were committed in a heinous, atrocious or cruel manner (HAC).
[2] (1) The triggerman, Joseph Sykosky, received a life sentence for his involvement in the murders (little, if any, weight); (2) Donaldson has a good prison record (some weight); (3) Donaldson and his family suffered numerous robbery attempts (slight weight); (4) Donaldson's family background and trauma suffered as a young boy due to the loss of his older brother (slight weight); (5) Donaldson's capacity for hard work (slight weight); and (6) Donaldson's church attendance as a boy (no weight).
[3] These claims include: (1) the trial court unconstitutionally denied Donaldson's right to testify during the guilt phase of the trial; (2) the evidence was insufficient to support Donaldson's convictions because it was based on contradictory testimony; (3) the trial court erred in admitting evidence of Donaldson's prior conviction for accessory after the fact where such evidence was inadmissible to prove the prior violent felony aggravator, the evidence became the feature of the penalty phase, and the State improperly argued to the jury that Donaldson's contemporaneous murder and prior conviction of accessory after the fact constituted two aggravating circumstances; (4) the trial court erred in admitting deposition testimony of a non-testifying codefendant during the sentencing hearing; (5) the trial court erred in finding and instructing the jury on the HAC aggravator where the statute and jury instruction are unconstitutionally vague and the evidence was insufficient; (6) the trial court erred in finding and instructing the jury on the CCP aggravator because the statute and instruction are unconstitutionally vague and the evidence established a pretense of legal or moral justification for the murders; (7) the trial court erred in finding the murder was committed during an enumerated felony; (8) the trial court erred in failing to admit, find, weigh and instruct the jury on evidence of nonstatutory mitigating circumstances; (9) the death sentence was disproportionate; and (10) the trial court departed from the sentencing guidelines without filing contemporaneous written reasons for the departure.
[4] In this case, Wengert testified that everyone, including Donaldson, was armed with a firearm and Donaldson instructed Sykosky to shoot the victims, whereas Straham said that he did not see Donaldson with a firearm during the entire episode and did not hear anyone order Sykosky to kill the victims. Although Straham and Wengert's testimony conflicted on these points, the jury, after listening to all the evidence, nevertheless determined what evidence was credible, and chose to convict Donaldson. Thus, we are unable to disturb the jury's verdict on this basis.
[5] The jury verdict form indicates only that the jury found Donaldson guilty of first-degree murder.
[6] Section 827.03, Florida Statutes (1993) provides as follows:

(1) "Aggravated child abuse" is defined as one or more acts committed by a person who:
(a) Commits aggravated battery on a child;
(b) Willfully tortures a child;
(c) Maliciously punishes a child; or
(d) Willfully and unlawfully cages a child.
(2) A person who commits aggravated child abuse is guilty of a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
§ 827.03, Fla. Stat. (1993).
[7] The only witness offered by the State during the penalty phase regarding the murders sub judice was Wendy Kane who merely corroborated testimony already introduced at trial. She testified that Donaldson "had called and told [Campbell] to walk out to the street where he could come by and shoot her."
[8] Under section 921.141(5)(b), the State may present evidence establishing that "[t]he defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person."
[9] Our ruling on this issue moots the appellant's numerous claims challenging the actual evidence offered by the State on this issue, much of which evidence the State acknowledged it had itself not found credible.
[10] Donaldson also claims that section 921.141(5)(h) and the standard jury instruction for the HAC aggravator are unconstitutionally vague and overbroad. Contrary to Donaldson's assertion, however, the instruction given to the jury in this case was approved by this Court in Hall v. State, 614 So.2d 473 (Fla.), cert. denied, 510 U.S. 834, 114 S.Ct. 109, 126 L.Ed.2d 74 (1993), and subsequently upheld after similar constitutional challenges. See James v. State, 695 So.2d 1229, 1235 (Fla.1997) (rejecting vagueness argument); Reese v. State, 694 So.2d 678, 685 (Fla.1997) (dismissing appellant's claim without discussion); Hartley v. State, 686 So.2d 1316 (Fla.1996). Thus, we find no error.
[11] Donaldson did not contest the court's finding as to the other elements of the CCP aggravator. Notwithstanding, we find competent, substantial evidence supports the trial court's finding that these murders were CCP. Both murders amounted to an execution-style killing exhibiting the cold nature of this homicide. See Lawrence v. State, 698 So.2d 1219, 1222 (Fla.1997); see generally Ferrell v. State, 686 So.2d 1324, 1330 (Fla. 1996), cert. denied, 520 U.S. 1173, 117 S.Ct. 1443, 137 L.Ed.2d 549 (1997). A significant amount of time elapsed during the course of the evening for Donaldson to contemplate these murders, thus establishing his premeditated design. Indeed, Donaldson twice asked someone to kill the victims by asking Wengert first, then Sykosky upon Wengert's refusal. These murders were not a result of an emotional frenzy or panic. Accordingly, we find no error.
[12] Donaldson also claims that the CCP statute and standard jury instruction are unconstitutionally vague. At the outset, we disagree with the State that the claim is procedurally barred, because Donaldson preserved the issue for appeal by submitting a proposed alternative instruction and raised an objection to the standard instruction at trial. See Monlyn v. State, 705 So.2d 1 (Fla.1997); Jones v. State, 690 So.2d 568, 571 (Fla.1996), cert. denied, ___ U.S. ___, 118 S.Ct. 205, 139 L.Ed.2d 141 (1997); Crump v. State, 654 So.2d 545, 548 (Fla.1995); Jackson v. State, 648 So.2d 85, 90 (Fla.1994). Although the claim was adequately preserved for review, we find it to be without merit. In Standard Jury Instructions in Criminal Cases, 665 So.2d 212, 213-214 (Fla.1995), we specifically approved the standard jury instruction on the CCP aggravator and therefore find no error on this basis. As for Donaldson's claim that the trial judge committed fundamental error in reading the CCP jury instruction to the jury because he omitted the word "premeditation" after the words cold and calculated in the "no pretense of a legal or moral justification" provision of the instruction, that issue is now moot.
[13] The State argues that Donaldson's claim is procedurally barred as he did not object to the Court's ruling. Contrary to the State's posture, however, Donaldson's claim is not barred because defense counsel correctly proffered the excluded testimony as is required to preserve the record for appellate review. See Lucas v. State, 568 So.2d 18, 22 (Fla.1990).
[14] The majority inexplicably concludes that the "trial court speculated that the victims undoubtedly heard Donaldson order Sykosky to kill them." Majority op. at 187. I find this to be a dubious conclusion in light of the fact that Wengert's testimony was that Sykosky was standing directly in front of the victims when Donaldson handed Sykosky the weapon and ordered him to "kill them." A conclusion that the victims heard Donaldson can hardly be categorized as speculation. It is more properly an obvious inference.